MAXEY v. UNITED STATES.

CRIMINAL LAW; DISCRETION; SEVERANCE; PRINCIPAL; ABORTION; TRIAL; EXPRESSION OF OPINION BY TRIAL COURT; CHARGE TO JURY.

1. Abuse of discretion by the trial court in overruling a motion for severance and separate trial by one of two defendants jointly indicted is not shown where the ground of the motion was that there was a confession by the other defendant in the hands of the prosecuting officer, which, it was believed, would be used as evidence, and no such confession was introduced at the trial.

2. A person who, although not personally present at the commission of a crime, advises, incites, or connives at the offense, or aids or abets the principal offender, is now a principal, under sec. 908, D. C. Code (31 Stat. at L. 1337, chap. 854) ; and it is not essential that any specific time or mode of committing the offense shall have been advised or commanded, or, if so, that it shall have been committed in the particular way instigated; or that there shall have been any direct communication between such person and the actual perpetrator.

3. On the trial of a man and a woman jointly indicted for the crime of abortion resulting in the victim's death, a motion by the man to direct a verdict in his favor is properly overruled, where it appears that he took the deceased and her sister near the woman's house, pointed it out to them, furnished them the exact amount of money charged by the woman for the treatment, told the deceased to tell the woman she was married and another person had sent her; waited for their return, and was informed that the woman had inquired who sent the deceased and had been answered as he directed, and that she had received and had been satisfied with the sum of money furnished.

4. One may be convicted as a principal, though acting in the commission of the crime through an innocent agent.

5. The expression of his opinion upon the facts by the judge of a Federal court in his charge to the jury is not reviewable on appeal, if no rule of law is incorrectly stated, and the matters of fact are ultimately submitted to the determination of the jury.

6. In a prosecution for committing an abortion resulting in death, where the trial court charged the jury that in considering the credibility of the sister of the deceased, who had testified against the defendant, and who, the court had previously stated, was technically an accomplice of the defendant, they might consider the comparative moral guilt of the two, it was *held* that, if this was to be construed as an expression of the court's opinion upon the facts, it was not error, as elsewhere in the charge the jury were told that the facts were for them to find.

7. Where the trial court on the trial of a man for having procured the commission of an abortion, and a woman for having committed it, after saying in the charge to the jury that, if they failed to find that the woman committed it, there was no offense on the part of the man, stated that, if they found she did commit it, the question would be whether he procured her "to do what she did," it was *held*, on a review of the charge, that it did not have the effect of withdrawing the question of the woman's guilt from the consideration of the jury and deciding it for them.

No. 1780. Submitted May 8, 1907. Decided June 4, 1907.

HEARING on an appeal by the defendants from a judgment of conviction by the Supreme Court of the District of Columbia, on a verdict of guilty, in a joint prosecution of the defendants for having committed an abortion.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

The second count of the indictment in this case charged substantially that Kate Maxey and Paul Meagher, on June 25, 1906, made an assault upon one Claudia Parrish, who was then and there pregnant with a child, as they both knew; that in making the assault they used an instrument, called a catheter, which they thrust into the womb of said Claudia Parrish, with intent thereby to cause a miscarriage; that they were not licensed practitioners of medicine, and the use of said instrument in said

way was not necessary to the preservation of the life or health of said Claudia Parrish; that by so doing they perforated and lacerated the womb of said Claudia Parrish, and did thereby cause a miscarriage; and that so doing and causing the said miscarriage they caused the said Claudia Parrish to be mortally sick, of which sickness she died on June 27 thereafter.

Defendant Meagher moved for a severance and a separate trial, on the ground that there was an alleged confession of the defendant Maxey in the hands of the district attorney, which, he believed, would be used as evidence, and if so it would seriously prejudice the case of this defendant. The motion was denied, exception taken, and the joint trial of the defendants was had. Each was found guilty as charged in the second count of the indictment; and, after motions for new trial had been denied, defendant Maxey was sentenced to be imprisoned for ten years, and the defendant Meagher for four years. Both have appealed.

The evidence produced by the government tended to show that Claudia Parrish, an unmarried girl of about sixteen years of age, had become pregnant several months prior to June 18, 1906. Some letters from her, and her elder sister May, who before the trial married one Brooks, written to Meagher in May and June, 1906, intimated the delicate situation of the former, and called upon him for interviews, and to do something for her. What he was expected particularly to do does not appear therein. May Brooks testified that she met Claudia and Meagher at Pennsylvania avenue and 7th street on June 18, 1906. They rode together on a street car, getting off at G street, S. W. Claudia was crying on the way. Meagher told them they should tell "Mrs. Pierce" that Claudia was married, and that "Mrs. Rock" had sent them to her. He showed them the house of "Mrs. Pierce," which was No. 41 G street, S. W. He said he would not go past the house with them, because she would think detectives were watching her. Just before getting to the house he got behind a woodpile at the corner, and stood there. He gave Claudia $10. "Mrs. Maxey" answered the knock at the door, and said she supposed she was the person looked for. She asked

if the visit was about "abortion business." She told them to sit down, as she had a patient in the back room. Returning she asked them if they knew "Mrs. Rock," and they said yes. She said she did not see why Claudia should not get over it, and said she had had many patients. Finally she took Claudia up stairs. She came down in about twenty minutes, with a towel in her hands that showed blood upon it. Holding it up she said it was unusual to get so much blood the first time. She gave Claudia some medicine, and told her to return the day after to-morrow. She said there was a possibility that Claudia might have to go to bed, and that she knew a "colored lady" who would take her in if she got sick; would find out and let her know Wednesday. The occurrence was on Monday. They left and met Meagher on the corner, and told him what had occurred. He asked if she inquired if they knew "Mrs. Rock," and they said yes, and that they told the woman they knew "Mrs. Rock" very well, and also that Claudia was married. He asked if the money was sufficient, and if Claudia was coming again. He was told that the money was sufficient, and that Claudia was to return on Wednesday. He rode part of the way home with them, furnishing the car tickets. Claudia remained with witness that night, and had two chills. Witness went to work during the day as telephone operator at the Riggs Hotel. Claudia was very sick Tuesday night, but got up Wednesday and left the house. Was hardly able to walk. On Thursday she came to the hotel, and was taken to Columbia Hospital about 12 o'clock, in a carriage. On cross-examination she said: When she discovered Claudia's condition early in May she did not advise her to go to anyone for treatment. Went to Dr. Walker's office with her early in May, but did not then know that she was pregnant; simply knew she was not well. She got a prescription filled after leaving the doctor. About a week before, as Claudia was not well, witness suggested Hunyadi Water. Did not know Claudia's real condition until about a month thereafter. The inquiries at the house of "Mrs. Pierce" were made by Claudia, and when asked if they had come on abortion business Claudia answered "Yes." Claudia asked how much it would be, and the woman said $10. Witness

was positive that there was blood on the towel, and the woman told her there was. In writing her letter to Meagher of June 10, telling him "it is up to you to do something," she meant it was up to him to help her and get her out of trouble, or else come forward and tell her father. Expected him then "either to marry her to get her out of trouble, or come forward and do something." She meant either to marry her or to tell her father; did not expect anything more. She meant, by asking him to come forward like a man with assistance, that the only thing she thought about was that he would marry her. Had no conversation with Meagher between that letter on June 10, and June 18, except by telephone. Asked him if he intended to get her out of trouble, and he said he would think about it. Told him to meet witness, but she did not see him until the meeting on June 18. She did not know that Claudia was taking drugs. Knew she had been taking Hunyadi Water, but it would never stay in her stomach; she could not keep it down long enough to call it a drug. The surgeon attached to Columbia Hospital testified that Claudia Parrish was brought to the hospital on June 21, 1906, about 1 o'clock. He made no examination that day. About 11 o'clock next day she had a miscarriage. The fœtus was about four months old. Found it impossible to prevent the miscarriage. Several hours after she came her pulse was 102. The second night she was delirious. Temperature went as high as 105, and her pulse as high as 160. She died on the morning of the 27th June of puerperal septicæmia. The infection was transmitted through the neck of the womb. If a catheter had been used— thrust into the neck of the womb—he would attribute the infection to germs carried in by the instrument. Cross-examined by defendant, witness said he had graduated at George Washington University in 1905, and had been connected with the hospital since July 28, 1905. He was twenty-eight years old. Had seen from thirty to forty cases of septicæmia due to abortion from natural causes or attempts. Claudia Parrish was, in his opinion, infected with septicæmia when she arrived. He judged from her condition. Made no examination of her parts until the time of the abortion. Being suspicious of septicæmia when she

came, he put her to bed to give her absolute quiet and rest. On the 26th there was an operation for draining the back of the womb to break up adhesions and offer a free drain of septic matter. She had the usual treatment of stimulation and support of vitality. An examination was made at the time of the miscarriage, but the womb was not cleaned out; it is never done. The conditions—temperature and bloody discharge—would not have existed from the use of drugs alone. If she had used a pencil it would depend on the amount of force. Was positive an instrument had been used. Did not examine the os uteri, but saw there were hemorrhages. Septicæmia was not due to drugs or the abortion. Germs could not be transmitted through drugs. Witness was cross-examined at length concerning his knowledge of the subject, generally and particularly, without eliciting anything of consequence. He disclaimed being an expert, and said he had not been called as one. Came to testify to facts. After the miscarriage, witness made a digital and a bi-manual examination. Digital is made with the fingers; bi-manual with one or two fingers inside the vagina or the uterus, and the hand on the outside. The hand pushed the uterus and the pelvic organs down so they could be palpated and a diagnosis made. Had reason to believe she was then suffering from septicæmia. The object of the digital examination was to determine whether there was complete or incomplete miscarriage. Found it complete.

Dr. Frye, a physician and surgeon who had devoted special attention to obstetrics and diseases of women for twenty years, testified. Saw Claudia Parrish in June last at Columbia Hospital, on 26th. Condition too critical to permit a serious operation. She was suffering from septicæmia. There had been an abortion. Nothing in her condition that showed any reason for an abortion as necessary to life or health. Cross-examined by defendants. Saw her about a day before operation; condition critical, but she was not delirious. There was an inflammatory mass around the pelvis formed as result of septic infection. Bigger than his fist, and came from womb. Drugs will not produce infection. If any membranes or blood clots remain it will

produce sapræmia. The germs in that case do not go into the system. Readily distinguishable from septicæmia. Puerperal septicæmia is too common after labor, but is preventable. In such cases the womb is nearly always infected by the doctor's fingers. Naturally the womb is sterile. It is possible that after miscarriage, in carrying the fingers into the womb, infection may follow. If the finger was put in the womb carrying infection, there might have been symptoms of infection in three or four days; but it would take a longer time to reach the stage of forming the inflammatory mass before mentioned.

Redirect examination: The condition which existed at time of operation on 26th could not have been produced by a surgeon making a digital examination on 22d, but could have been produced by means of a catheter put in the womb on the 18th.

Re-cross-examination: A pencil would have produced the condition as well as a catheter, but drugs could not. If decomposed tissue is left in the womb after miscarriage the germ will work much quicker than if it had been fully cleansed. It is not an acknowledged fact among the medical profession that it is proper treatment to work out and disinfect the uterus with a solution of bi-chloride of mercury or hot water. It is proper for sapræmia, but if you have the streptococci infection, the worst thing you can do is to cleanse the uterus. It opens up a fresh surface for infection. Never heard of a case of inevitable abortion and septicæmia at the same time. The infection would accrue only after abortion had existed. Do not see how one could get infected if threatened with abortion. In case of inevitable abortion would certainly assist it. Would cleanse the uterus. Would allow twenty-four hours. There is generally hemorrhage, and you cannot delay much longer. Would delay twenty-four hours, and then effort would be to cleanse the uterus.

Dr. Stone, another specialist in abdominal surgery and diseases of women, was produced by the government. His testimony was similar to that of Dr. Frye.

Two witnesses for the government testified that Mrs. Maxey

had made a statement which had been reduced to writing, but it was not produced in evidence.

Policeman and Detective Grant testified to the finding of a catheter in the house of defendant Maxey on night of 23d or morning of 24th. He produced the instrument, and it was shown to the jury.

Dr. Walker testified that on May 21, 1906, Mrs. Brooks and Claudia came to his office together. Claudia was suffering from amenorrhœa. Made no examination. She had missed her periods, and he gave her some simple remedy. Treated her for cold. Cross-examined by defendant: Made no examination at all. Attributed missing periods to a cold. Did not prescribe Hunyadi Water.

It was then proved that the names of neither Kate Maxey nor Kate Ellis appeared on the record of licensed practitioners.

The government rested, and Meagher moved the direction of a verdict of not guilty, on the ground that the evidence failed to show his guilt, and, further, that there was no evidence tend-ing to show that he had incited, advised, aided, abetted, coun-seled, or assisted Mrs. Maxey, but that it showed that the only assistance or suggestion given by him was exclusively for and in aid and at the request of, and carried out by and through, the victim, Claudia Parrish, who is innocent of any offense. This motion was denied, and exception noted.

On behalf of defendant Maxey, Mrs. Mary Lackey testified: Is daughter-in-law of defendant Maxey, and lived with her fif-teen years. Resided at 41 G street, S. W. Was at home June 18, and saw May Brooks, with another young lady; when they came was up stairs. Occupied back room, connecting with de-fendant's room by door. Door was open and heard conversa-tion. Claudia Parrish said she used Hunyadi Water and some kind of pill some time before. Defendant said, "My, my, what are you trying to do?" Claudia said: "Well, I am bound to get rid of it. I am going to do something very rash." She re-turned on Wednesday, went in parlor with defendant Maxey; remained five or ten minutes. Asked Mrs. Maxey if she had got a place for her. She said no. Heard no other talk on Mon-

day with defendant about procuring an abortion. She identified the catherer. Said it belonged to her. Defendant used it on witness by order of a doctor, to draw water. Never knew of defendant performing or attempting an abortion. On her cross-examination she added to the former statement of deceased as to use of Hunyadi and pill, the use of a lead pencil to bring on a miscarriage. On behalf of defendant, Meagher was offered and read the correspondence referred to in statement of Mary Brooks's testimony.

The motion of Meagher to return a verdict was renewed, and again overruled. Exceptions to the refusal of special instructions, and to certain parts of the charge, will be stated in the discussion of errors assigned thereon.

*Mr. Robert E. Mattingly* for the appellant Maxey.

*Mr. John C. Gittings* and *Mr. Justin M. Chamberlin* for the appellant Meagher.

*Mr. Daniel W. Baker,* United States Attorney for the District of Columbia, and *Mr. Stuart McNamara* and *Mr. Charles H. Turner,* Assistants, for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. There was no error in denying the motion of defendant Meagher for a separate trial. This is a matter within the discretion of the trial court, whose action will not be reviewed unless clearly made to appear that the party sustained substantial prejudice. Nothing of the kind has been shown. The expectation of the introduction of a confession of the codefendant—the single ground of the motion—was not realized.

2. The evidence on which the conviction was had has been given at considerable length in the statement of the case, because of the assignment of error on the refusal of the court to direct a verdict of not guilty as to Meagher, on the ground that the

evidence did not show the commission of any offense by him. The contentions of the appellant are, first, that there is no evidence to show that the abortion was caused by the use of a catheter as charged in the indictment; second, assuming there was evidence sufficient to warrant the conviction of Maxey, there was a total lack of evidence tending to show that Meagher advised, aided or abetted, or assisted Maxey; on the other hand, it shows that the only assistance given and every suggestion made by him was exclusively for, in aid of, and at the request of the victim, who was innocent of any offense.

(1) The evidence was ample, in our opinion, to warrant the jury in finding that Maxey caused the abortion, and in inferring that it was by the use of the catheter found in her house.

(2) It is manifest that Meagher was not personally present, inciting Maxey to, and aiding her in fact in, the performance of the criminal act. All that was necessary, however, was to prove facts and circumstances from which it might be inferred, with sufficient certainty, that he abetted the performance of the criminal act in such a way as to constitute him a principal offender under the provisions of sec. 908 of the Code [31 Stat. at L. 1337, chap. 854], which reads as follows: "In prosecutions for any criminal offense, all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals, and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be." One who procures, commands, advises, instigates or incites the commission of an offense, though not personally present at its commission, is, by the common law, an accessory before the fact. 1 Am. & Eng. Enc. Law, p. 258; 12 Cyc. Law & Proc. p. 190; *Com.* v. *Smith,* 11 Allen, 243, 256; *McCarney* v. *People,* 83 N. Y. 408, 412, 38 Am. Rep. 456; *People* v. *McKane,* 143 N. Y. 455, 464, 38 N. E. 950; *State* v. *Maloy,* 44 Iowa, 104, 113; *Hughes* v. *State,* 75 Ala. 31, 35; *Griffith* v. *State,* 90 Ala. 583, 588, 8 So. 812. The section of the Code above quoted makes all such persons principals. And it is not essential that any

specific time or mode of committing the offense shall have been advised or commanded, or, if so, that it shall have been committed in the particular way instigated. *Griffith* v. *State,* supra; *Pearce* v. *Oklahoma,* 55 C. C. A. 550, 118 Fed. 425. Nor is it necessary that there shall have been any direct communication between the actual perpetrator and the accessory, who, under the Code, is now a principal. *Com.* v. *Smith,* supra.

Applying these principles to the evidence, we think it was properly submitted to the jury. It appears from the testimony of May Brooks, the credibility of which was for the jury to determine, that neither she nor her sister knew the defendant Maxey; that they had never heard of her save through Meagher; that he took them near Maxey's house and pointed it out to them; that he furnished them the exact amount of money charged for the treatment; that he told Claudia Parrish to tell Maxey that she was married and that "Mrs. Rock" had sent her; and that he waited for their return from the house, and was informed that Maxey had inquired who sent her and had been answered as he had directed; also that she had received, and been satisfied with, the sum of money furnished. The daughter-in-law of Maxey, produced as a witness by the latter, corroborated this evidence as to the fact of the visit on Monday, her talk about an abortion, and the return of Claudia on Wednesday. From this evidence it might be inferred that Meagher arranged with Maxey for the treatment, was informed of its cost, and that the statement that Claudia was a married woman and had been sent by "Mrs. Rock" was a prearranged password by which Maxey might be assured that the girl was sent by him to be operated upon. Whether the particular means to procure abortion had been suggested or provided for is, as we have seen, immaterial. It has not been contended that the evidence of the surgeons was not ample to warrant the belief that septicæmia was superinduced by the treatment of Maxey, and was the efficient cause of the death that speedily ensued.

(3) The charge of the court, which was also excepted to, instructed the jury that they could find Meagher guilty as charged, if satisfied beyond a reasonable doubt that he, though

the victim and her sister, procured the act to be done by Maxey; that is to say, if they were his agents to go to her and have the act performed they were acting for him, and what they did became his act. The ground of the motion, applicable to this particular bearing of the evidence, was that "the evidence conclusively shows that the only assistance given, and every suggestion made by Meagher, was solely and exclusively to, and for, and in aid of, and at the request of, and carried out by and through the victim, Claudia Parrish, who is innocent, in the eyes of the law, of any offense whatever." The evidence, however, goes beyond a mere suggestion of the act to the deceased, for it shows that he went with her to the place and directed her to the person, both before unknown to her, and then gave her the necessary money to procure the performance of the act. Being of the opinion that the evidence was sufficient to warrant submission to the jury on the issue charged, the question raised goes to its efficiency, as matter of law, to show the commission of any offense by Meagher. In other words, did the court take a correct view of the law as applied to the evidence? The contention of counsel for the appellant is thus stated: "One who counsels with and gives aid to a woman who may be pregnant, in relation to her endeavor to secure someone to perform the crime of abortion upon her person, is guilty of no offense, provided he does not counsel with, aid, or abet the person committing the crime." The proposition, as stated, is incorrect in the assumption that the defendant merely aided the deceased "in relation to her endeavor," because the evidence tended to show that her action was taken at his instigation and through his aid also. Assuming, then, that the deceased, though consenting to the commission of the criminal act, was herself guilty of no offense in law, as contended, is it true that the defendant, who instigated the act, designated the person, and furnished the money for its performance, is equally guiltless in contemplation of law? We are of the opinion that he is not. As has been said by the Supreme Court of the United States: "It is the known and familiar principle of criminal jurisprudence, that he who commands or procures a crime to be done, if it is done, is guilty

of the crime, and the act is his act. This is so true that even the agent may be innocent, when the procurer or principal may be convicted of guilt, as in the case of infants or idiots employed to administer poison. The proof of the command or procurement may be direct or indirect, positive or circumstantial; but this is matter for the consideration of the jury, and not of legal competency." *United States* v. *Gooding,* 12 Wheat. 460, 469, 6 L. ed. 693, 696. See also 1 Bishop, Crim. Law, secs. 649, 651, 652; *People* v. *Adams,* 3 Denio, 190, 207, 45 Am. Dec. 468; *Seifert* v. *State,* 160 Ind. 464, 467, 98 Am. St. Rep. 340, 67 N. E. 100. Those authorities fully sustain the general principle of law declared by the court, that one may be convicted as a principal, though acting in the commission of the crime through an innocent agent. Save the case last cited, however, they are not directly in point in respect of the application of the principle to the particular phase of the case as presented.

In the case referred to (*Seifert* v. *State,* supra) the evidence tended to show that the appellant, charged by a woman with responsibility for her pregnancy, gave her a catheter, advising and directing its use to procure a miscarriage. She used the instrument, producing a miscarriage that caused her death. In affirming the conviction the court said: "The first question presented is whether a person who procures an instrument for a woman, which he advises and directs her to use upon herself to procure a criminal abortion, can be convicted as a principal where the woman, pursuant to such advice and direction, uses such instrument for such purpose in the absence of the former, thereby causing her to miscarry and die. Assuming, without deciding, that it was not the purpose of the legislature in the enactment of sec. 1857, Burns's 1901, entirely to blot out the distinction between principals and accessories, we think that it may still be affirmed that appellant was properly charged as principal. While the principal in the commission of a felony must be actually or constructively present at the time of its commission, * * * yet a person who causes such a crime to be committed through an innocent agent is deemed constructively present. * * * This fiction of the constructive presence

of the real instigator and promoter of the crime is indulged in a case where an innocent agent commits the act because there would otherwise be no principal. This being the reason for the doctrine, it is evident that the test as to whether the former is a principal or an accessory does not depend upon whether the agent is morally innocent, but upon whether he is criminally responsible for the particular crime charged." After saying that the penalties of the act are denounced not primarily, if at all, against the woman, but against the third person, the court proceeded to say: "Moreover, if the act, done with the criminal purpose, eventuates in the death of the woman, that is a substantive offense * * * and as it is not consummate until her death, it is evident that she cannot become the principal, and that for want of some principal whom the third person may be regarded as an accessory to, the latter must be treated as a principal, or else we have the solecism of a felony without a principal. It is argued by appellant's counsel that there was no principal, and therefore no crime. The maxim *Qui facit per alium, facit per se* is of extensive application in the criminal law, and, if the State's theory of the facts be assumed, it may be stated that appellant was clearly within the operation of the maxim as a working rule." Approving the reasoning of that case, we can see no substantial ground upon which it can be distinguished from this. Though the facts are not identical they are of the same substantial nature. Our Code obliterates the former distinction between principals and accessories before the fact which that court had to take into consideration. The cases relied on by the appellant are: *Com.* v. *Drake,* 124 Mass. 21; *People* v. *McGonegal,* 136 N. Y. 62, 32 N. E. 616; *People* v. *Balkwell,* 143 Cal. 259, 76 Pac. 1017. Without reviewing those cases, we think it sufficient to say that they present a very different state of facts. In the *McGonegal* and *Drake* Cases, that are chiefly relied on, defendants apparently did no more than accompany the party practised upon, furnishing the aid and comfort of their presence; neither of them advised or procured the treatment, or furnished the opportunity and means therefor. Their conduct, though they did not go so

far, more nearly resembled that of the witness May Brooks; and it was contended by the appellant, as well as declared in the charge of the court, that she was an accomplice in contemplation of law. The court did not err in denying the motion upon each ground.

3. Errors have been assigned on exceptions taken to the refusal of the court to give to the jury the first and second special instructions prayed by the defendant Meagher, as well as to parts of the charge. The special instructions required the exclusion, from the consideration of the jury, of so much of the testimony of the witness May Brooks as related to conversations between her and her sister and the defendant Maxey; and further declared the law applicable to the case in accordance with defendant's view of the elements necessary to constitute the crime charged against him. The exceptions to the refusal of these, as well as those taken to so much of the charge as declared the legal responsibility of defendant for the act procured to be done by the deceased, if acting under his instigation, have been substantially considered and disposed of under the preceding assignment. Further discussion is unnecessary.

4. The fifth special instruction asked on behalf of the defendants, though refused, was substantially embraced in the charge in the following words:

"Now, as to Mrs. Brooks's testimony: It has been argued to you that she is an accomplice with Mrs. Maxey, that if Mrs. Maxey did commit this crime then Mrs. Brooks aided her or procured her in such a way that she is to be treated as an accomplice. I have held that, strictly, she stands in that position. The general rule is that, where an accomplice testifies in a case, his or her testimony is to be taken with great caution, because of the guilt which he has to admit himself as against himself. And the rule is that the jury are to be cautioned not to find defendants guilty upon the uncorroborated testimony of accomplices. They may do so, but the rule is for the court to caution them and advise them not to do that without corroborating testimony."

The court then proceeded to add: "But you are to consider the comparative guilt of the two parties in a case like that,

Mrs. Maxey and Mrs. Brooks, in determining how morally guilty Mrs. Brooks was in what she did. And there is testimony in the case tending to corroborate Mrs. Brooks in some parts. For instance,—it is only an instance,—she says that the girl was to come back there the next day but one. This is corroborated by the testimony of Mrs. Lackey, the witness introduced by the defendant, that she did come back there the next day but one; and the fact that the girls were there at the house is testified to by Mrs. Lackey. The fact that Claudia went up stairs is corroborated by Mrs. Lackey, and that there was talk there between them on the subject of an abortion. This, and perhaps other circumstances that may occur to you, tend to corroborate the story of Mrs. Brooks. So that, as the case is situated, taking it as a practical case, it is one in which if you believe the testimony of Mrs. Brooks you have a right to receive it and give credit to it, and to find a verdict upon it if you find it corroborated in other material particulars by other testimony or by facts which there is no testimony about."

To this addition, save the last sentence, defendants excepted, and have assigned error thereon. The contention in support of this assignment is that, while the court charged that May Brooks was a technical accomplice, and that her testimony must be taken with caution, it removed the beneficial effect thereof by the reference to her criminal conduct, as compared with that of Maxey. It is argued that this, and the further statement as to her corroboration, constitute an unwarrantable comment on the evidence, highly prejudicial to both defendants. The rule of practice in respect of charging a jury, that prevails in the Federal courts, has been declared by the Supreme Court of the United States as follows: "It is true that in the Federal courts the rule that obtains is similar to that in the English courts, and the presiding judge may, if in his discretion he think proper, sum up the facts to the jury; and if no rule of law is incorrectly stated, and the matters of fact are ultimately submitted to the determination of the jury, it has been held that an expression of opinion upon the facts is not reviewable on error. *Rucker* v. *Wheeler,* 127 U. S. 85, 93, 32 L. ed. 102,

106, 8 Sup. Ct. Rep. 1142; *Lovejoy* v. *United States,* 128 U. S. 171, 173, 32 L. ed. 389, 390, 9 Sup. Ct. Rep. 57. But he should take care to separate the law from the facts, and to leave the latter in unequivocal terms to the judgment of the jury as their true and peculiar province. *M'Lanahan* v. *Universal Ins. Co.* 1 Pet. 170, 182, 7 L. ed. 98, 104. As the jurors are the triers of fact, expressions of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments. They should be made distinctly to understand that the instruction is not given as to a point of law by which they are to be governed, but as a 'mere opinion as to the facts, to which they should give no more weight than it was entitled to." *Starr* v. *United States,* 153 U. S. 614, 624, 38 L. ed. 841, 845, 14 Sup. Ct. Rep. 919. We are not certain that the language referred to, if unqualified elsewhere in the charge, was in violation of the rule stated. The jury was told that in considering the credibility of the witness, as an accomplice of the defendant Maxey, they might consider their comparative moral guilt. That there was a difference in this respect was obvious to everybody; but the jury were not told that there was in fact. The legal effect of the testimony of the defendant's witness, Lackey, was, if credible, to corroborate the statements of the witness May Brooks in certain material points; and this is all that the jury were charged. If any impression to the contrary, however, could have been made upon the jury, it was removed in the very next sentence quoted above. Moreover, the court, having before charged the jury that the presumption of innocence attended the defendants at every stage, and that their guilt must be shown by the evidence beyond a reasonable doubt, addressed them, in conclusion, as follows: "You begin with the presumption that the defendants are entirely innocent, and you entertain no idea that they are guilty except such ideas as necessarily flow from the testimony that you hear introduced. But you treat them and look upon them as innocent, until the evidence, and the evidence alone, has entirely satisfied your minds that they are guilty as charged." Again, when the charge had been given and the exceptions were noted before the jury retired, and in reply

to an exception taken to another statement, on the same ground, the court said to the jury: "Of course, I am not advising you as to what you are to find. Of course that is all for you to say." If, then, the language excepted to could be certainly considered as an expression of opinion by the court, the jury were left free in the exercise of their own judgment.

5. Another assignment of similar purport remains to be considered. In charging the jury, the court treated the case of the defendants separately, first taking up that of the defendant Maxey. In so far as it related to her, no exception was taken. In concluding that portion of the charge the court said: "Now, as I said before, if you fail to find that Mrs. Maxey did commit the abortion as charged in the indictment, then there is no offense against Mr. Meagher. But if you find that she did procure the abortion, considering the testimony which was admissible against her simply, then the question arises, is Mr. Meagher guilty? Then you would 'revieve' (evidently 'review' was the word used) the testimony as to his part in the transaction, the testimony as to what occurred before the girls went to the house, and how they happened to go there. The question then would be for you to determine whether he did, through the girls, procure Mrs. Maxey to do what she did." The contention is that the words used in the last sentence were equivalent to a statement that Mrs. Maxey had in fact committed the act charged. In other words, the court having fully and fairly charged the jury on the case against Maxey, telling them that they could not find her guilty unless they believed from the evidence, beyond a reasonable doubt, that she did commit the act as charged, and that if they did not so find there could be no case against Maxey, is to be held to have finally withdrawn the question of her guilt from the consideration of the jury, and decided it for them. It is impossible to conceive that the jury could have had any other impression than that the statement was necessarily founded upon the assumption that they should previously have reached the conclusion that Maxey was guilty, for otherwise they could not consider the case against Meagher at all. The meaning of the court, if by any possibility

doubtful, was made perfectly clear by what was said when the exception was noted. Both defendants stated an exception to this part of the charge, as stated in the bill of exceptions, as follows: "In putting the proposition to the jury in the form of a question, and using these words, assuming you find these facts as I am—Your Honor predicated—The Court: 'I do not think I used that language.' Counsel: 'You asked them about the abortion first; that proposition you must find. Then you proceeded with the second proposition, assuming you find these facts as I am. When you put the second proposition. In that connection we desire to note an exception.' The Court: 'I think the jury will not be misled by the last part of it. Of course the form in which I stated it to you I do not remember. But you need to find certain things in order to find an offense at all. If you do not find that, there will be a verdict of not guilty. Going on from that point, I assumed you did find that, and dealt with the further testimony. Of course I am not advising you as to what you are to find. Of course that is all for you to say.'"

Having considered all the important questions raised on the record, we find no error in the proceedings on the trial. The judgment against both appellants will therefore be affirmed. It is so ordered.                    *Affirmed.*