Lawrence M. BOLET, Appellant,

v.

UNITED STATES, Appellee.

No. 79–652.

District of Columbia Court of Appeals.

Argued April 9, 1980.

Decided June 13, 1980.

Rehearing and Rehearing En Banc Denied Aug. 1, 1980.

Melvin G. Bergman, Riverdale, Md., for appellant.

Thomas C. Hill, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell and James M. Hanny, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, NEBEKER and PRYOR, Associate Judges.

KELLY, Associate Judge:

Appellant was found guilty of false pretenses, D.C. Code 1973, § 22–1301, by the Honorable Leonard Braman, sitting without a jury. On appeal, he challenges Judge Braman's ruling that a conviction for false pretenses may lie where the misrepresentation is made to a third party rather than directly to the victim. We agree with the analysis contained in Judge Braman's excellent opinion, attached as an appendix hereto and adopt it as our own. Accordingly, the judgment of conviction on appeal is

*Affirmed.*

APPENDIX

MEMORANDUM AND OPINION

The question at bar is whether the scope of our false pretenses statute, 22 D.C. Code § 1301 (1973), is limited to misrepresentations made by a defendant directly to his victim. The issue arises in a non-jury trial at which, after hearing testimony, the court made findings of facts and conclusions of law from the bench. The legal issue here posed was taken under advisement; following the submission of memoranda, the court resolved the question against the defendant and pronounced him guilty on February 16, 1979. The essential findings may be summarized as follows:

## I

Ruth Blair, the complaining witness, is a 72 year old woman with a 6th grade education. She is unknowledgeable in business matters, including the purchasing and financing of automobiles.

On March 21, 1977, Ms. Blair, accompanied by her apparent common law husband, went to Senate Dodge in the District to trade in her old car and buy a new one. Although Ms. Blair did not drive, her husband did and chauffeured her about. Ms. Blair purchased a 1977 Dodge Aspen after the salesman cleared the purchase with Senate's general sales manager, the defendant, Lawrence Bolet. The purchase price was $5,843.75 (including $298.75 in government charges). Ms. Blair made a downpayment of $843.75 leaving a balance of $5,000 outstanding.[1]

Later the very same day, the husband died. Since Ms. Blair had no further use for the car, she called the salesman on the following day, March 22, explained the circumstances, and stated that she wished to return the car and cancel the purchase. The defendant, when informed of this advised the salesman that Ms. Blair would be required to pay an additional charge of $500 for return of the car. After telling the defendant that his position was unfair, the salesman (with the permission of Senate's president) stopped the transmittal of the car's title papers to the District. This permitted Senate, if it accepted return of the car, to resell it to another customer as a new car. Later, when he learned that Ms. Blair would be asked to sign a note for $500, the salesman called her and advised her against doing so. At some point during that day, Ms. Blair spoke with the defendant who, being unable to induce her to keep or dispose of the car, agreed to try to sell it for her.

On the following day, March 23, the car was driven by a friend to Senate. Pursuant to defendant's statement to Ms. Blair that the car would have to be sold as a used car and at defendant's direction, the car was parked on the used car lot. He also told the complainant that Senate would charge her an additional $500 for the return of the automobile. Ms. Blair demurred and left the car at Senate.

Later, the defendant sent another salesman to the complainant's home to obtain her signature on a (1) $500 note and (2) a contract for Senate's repurchase of the car. Being determined not to sign the note and forewarned by the first salesman's call, Ms. Blair refused to answer the door.

On March 25, the complainant went to the D.C. Department of Consumer Protection where she was assisted by a Mr. Ruiz. Ruiz called the defendant in the complainant's presence and inquired about the transaction. The defendant, aware that Ms. Blair was in Ruiz's office seeking his advice and help, stated that: (1) The car was now a used car and Senate could not sell the car as a new one; (2) The car had depreciated and he would not permit rescission unless Ms. Blair signed a $500 note to cover the depreciation; and (3) The car's value was $4500, and he would try to sell it for that price. He promised to inform Ruiz later that day of the status of the car. When Ruiz called the defendant later the same day, the defendant told Ruiz that he had found a buyer for the car for $4500. These representations were made to persuade Ruiz and Ms. Blair that, because of the continuing depreciation of the car (which she could not drive), the note should be signed promptly in order to avoid further loss through depreciation. Further the representations were made to Ruiz with the intent that he repeat them then and there to Ms. Blair advise her to sign the note. In short, the defendant used Ruiz as a conduit through which his representations passed to the complainant who was then present in Ruiz's office.

Ruiz, persuaded by the defendant's representations, repeated them to the complainant and advised her to sign the $500 note.

---

1. The car was to be financed (for a charge of $1,399.84 through Chrysler Credit, with 48 monthly installments of $133. Ms. Blair's 1975 Dodge Dart was traded in for the balance due ($2,189.00) the company which financed that car.

In reliance upon the representations and Ruiz's advice, Ms. Blair reversed her position against signing the note.[2]

The defendant knew that his representations were false: (1) There was no interested buyer for the car on March 25, the day defendant spoke with Ruiz; (2) Senate was able to treat the car as a new car on resale;[3] and (3) The car had not depreciated $500.[4] The defendant's intent, beginning on March 22, when Ms. Blair called to cancel the sale, was to defraud her.

Ms. Blair returned to Senate to sign the note on March 28, 1977. Only the day before, however, Irene Broadnix had signed a contract to buy the Blair car from Senate for $5,326.75. Although originally written up as a used car, the purchase order was changed to reflect the sale of a new car. The defendant was apprised of the details of this transaction.

When Ms. Blair later came in to sign the note, the defendant spoke to her and directed her into an office to sign the $500 note. Ms. Blair complied and, in the presence of a salesman (the same person who had gone to her house to get her to sign the note and later sold the car to Broadnix), executed the note and, unbeknownst to her, a repurchase agreement selling the car back to Senate. At no time did the defendant correct any of his misrepresentations of March 25. Specifically, although he knew even as Ms. Blair was signing the note that Senate had contracted to sell the car as new to Broadnix for $5,326.75, the defendant did not modify his misrepresentations, previously funnelled through Ruiz, that the car was a used car and had a value of only $4,500. Ms. Blair executed the instruments on March 28, 1977, in reliance upon those misrepresentations.[5]

Later in the same day, March 28, Ms. Broadnix returned to Senate. A second purchase order was signed which increased the price of the car by $290.85 to $5,617.60, and the car was sold on that basis.[6]

## II

Our statute (§ 22–1301) provides that Whoever, by any false pretense, with intent to defraud, obtains from any person any service or anything of value, or procures the execution and delivery of any instrument of writing . . . or the signature of any person, as maker, en-

2. It was further found that, but for defendant's representations, (1) Ruiz would not have advised the complainant to sign the note, and (2) the complainant would not have signed the note on March 28, 1977.

3. The ability to resell the car as new turned upon whether the title papers were delivered by Senate to the District. The defendant knew that the papers had not gone out because, in the normal course, a minimum of four to five days was necessary for the papers to clear Senate. Further, as defendant also knew, the salesman had stopped the transfer of the title papers. In fact, as will be pointed out, the car was resold as a new car.

4. Not only was the defendant aware that the car could be sold as new, he also knew the car had been driven only seventeen miles, nine of which were chargeable to Ms. Blair. The trade practice involving company cars, demonstrators and "spotted" cars, which of course was well-known to defendant, belied any such depreciation. In fact, as will be shown, the car was later resold for more than $5,600.00, a price substantially above dealer's cost which, according to defendant, was $5,080.00.

5. When Senate pressed her for payment of the note, Ms. Blair went to the Automotive Owners Action Council on April 8, where she spoke with Archie Richardson. Richardson telephoned defendant who deceitfully repeated his earlier misrepresentations. In particular, he told Richardson that the car had been sold for $4500, whereas he knew that Broadnix had taken delivery of the car a week earlier at a purchase price of over $5600. Although these repeated misrepresentations came *after* the complainant had signed the note and thus there could be no detrimental reliance, the reiterated deceit does illuminate a mind cognizant of an accomplished fraud and bent upon covering it up.

Senate sued Ms. Blair on the $500 note in the Small Claims Branch of this Court on June 6, 1977.

6. The salesman justified the increase by explaining the prior sale, that only nine miles had been put on the car and that it was being sold as new. Also on the same day, Ms. Blair's trade-in, the 1975 Dodge Dart (with only 6,060 miles on it) was resold for $2,731.00, $542.00 more than Ms. Blair had been given for it. *See* note 1 *supra*.

dorser, or guarantor, to or upon any bond, bill, receipt, promissory note, draft, or check, or any other evidence of indebtedness, . . . shall be . . . [punished].

It is apparent that the statute does not by its terms exclude the misrepresenter whose lie is passed on through a third person. The defendant, however, contends that *Foster v. Goldsoll*, 48 App.D.C. 505 (1919), authoritatively read into the statute a requirement of direct communication.[7]

Neither our false pretenses act nor *Foster* was an expression of first impression. Rather they are part of a history of consumer law which stretches back over several centuries during which legislators and judges struggled fitfully to subject the machinations of the swindler to the rule of law. The District's statute reflects one of the earliest efforts to redress the problem through the use of criminal sanctions. *Robinson v. United States*, 42 App.D.C. 186, 192 (1914), recognized that "[o]ur false pretenses statute, like most American statutes on the subject, is modeled after the statute of 52 Geo. III, chap. 64, ¶ 1 [1812]." But the roots of our statute go deeper, for in enacting it (and the predecessor District statute on false pretenses[8]) "Congress had . . in view" the earlier English statute of 1757, 30 Geo. 2, c. 24, § 1, *Jones v. United States*, 5 D.C. (5 Cranch) 647, 654 (1840) (Cranch, C. J.),[9] an enactment which appears to have been common law in this country. *Biddle v.*

*United States*, 156 F. 759, 762 (9th Cir. 1907).

The English cases leave little doubt as to how the question at bar would be resolved under that country's false pretenses statutes (which shaped the law of our own jurisdiction). In the leading case, *The Queen v. Butcher*, 8 Cox C.C. 77, 169 Eng. Rep. 1145 (1858), the defendant promised to tip a young boy if he obtained the wages of two workers from their employer. The youth obtained the money after representing that he had been sent by the employees for it. While faulting the government's case because of a defective indictment, *Butcher* made a significant contribution to the criminal law by establishing that one who wilfully instigates a false representation may violate the false pretenses statute. The defendant was "responsible for the representation made by the boy as his innocent agent" and was as culpable "as if he, the prisoner, had gone to the pay-table and made the false representation himself." *Id.* at 83, 169 Eng.Rep. at 1150.[10]

That guilt could attach by instigating deception through an innocent intermediary was earlier recognized by the trial court in *The Queen v. Brown*, 2 Cox C.C. 348 (1847) (false representation to *A* that *B*'s goods were delivered, thereby causing *B* to make payment). *Brown* held "[t]here was nothing in the Act of Parliament which made it necessary that the pretence should be made

---

7. Indeed, the *Foster* case has been cited for the proposition that "the false representation must be made to the person defrauded." 22 D.C. Code Encycl. § 1301 (West 1967).

8. The Penitentiary Act of 1831, ch. 37, § 12, 4 Stat. 448.

9. 30 Geo. 2, c. 24, § 1 provided that "all persons who knowingly and designedly by false pretense or pretenses shall obtain from any person or persons, money, goods, wares or merchandizes, with intent to cheat or defraud any person or persons of the same" shall be guilty of the crime of false pretenses. The later statute, 52 Geo. 3, c. 64, § 1 (1812) (cited in *Robinson*) amended 30 Geo. 2, c. 24 by extending its provisions to cover explicitly cases where the victim is defrauded of a chose in action (*i. e.*, "any bond, bill of exchange, bank note, promissory note . . .."). The origin of the prohi-

bition against false pretenses, however, goes back to the 16th century when 33 Hen. 8, c. 1 (1541) outlawed false pretenses by "false token or counterfeit letter." See 4 W. Blackstone, Commentaries 159 (11th ed. 1791); 10 Halsbury's Laws of England § 1586 at 821 & n. (f) (3d ed. 1955).

10. The *Butcher* case was decided under 7 & 8 Geo. 4, c. 29, § 53 (1827) which, *inter alia*, consolidated the three separate false pretenses statutes into a single enactment. See note 9 *supra*. It was essentially identical to those statutes and provided that every "Person [who] shall by any false Pretence obtain from any other Person any Chattel, Money, or valuable Security, with Intent to cheat or defraud any Person of the same . . . shall be guilty . . . .."

to the same person as the money was obtained from; and when it was said that 'by means of the said false pretenses' the money was obtained, that was a question of evidence; and if there were any means to shew that pretence to A. operated on the mind of B., it might be shewn in evidence." 2 Cox C.C. at 352. *Cf. The Queen v. Rouse*, 4 Cox C.C. 7 (1849) (false representations to *A* by which money was obtained from *A* through *B*; the court likened *B*, an innocent actor, to a "mechanical instrument" whose participation makes possible the accomplishment of the crime of false pretenses).

### III

The general receptivity of English courts toward their false pretenses law was incorporated at an early date into the law of the District of Columbia in *Jones v. United States*, 5 D.C. (5 Cranch) 647 (1840). Chief Judge Cranch rejected a pinched construction of the District's false pretenses statute by quoting Lord Kenyon in *Young v. The King*, 3 T.R. 98, 102 (1789):

> [B]ut when the criminal law happens to be auxiliary to the law of morality, I do not feel an inclination to explain it away. Now this offence is within the words of the act; for the defendants have, by false pretences, fraudulently contrived to obtain money from the prosecutor; and I see no reason why it should not be held to be within the meaning of the statute.

5 D.C. (5 Cranch) at 653–54 (emphasis added). The gloss thus given to our statute's expansive words enabled it to vie with the diversity and ingenuity of the swindler's schemes.[11]

The courts, of course, were hardly inventing new doctrine in condemning false pretenses perpetrated through an innocent instrumentality. The rule in *Butcher* is but a corollary of the well-established proposition that was recognized 31 years before in *United States v. Gooding*, 25 U.S. (12 Wheat.) 460, 469, 6 L.Ed. 693 (1827), as

> the known and familiar principle of criminal jurisprudence, that he who commands, or procures a crime to be done, if it is done, is guilty of the crime, and the act is his act. This is so true, that even the agent may be innocent, when the procurer or principal may be convicted of guilt. . . .

*Accord, Beau Soliel v. United States*, 71 App.D.C. 111, 116, 107 F.2d 292, 297 (1939); *Maxey v. United States*, 30 App.D.C. 63, 75–76 (1907).

The clinching link between the instrumentality doctrine developed in the English false pretenses cases and the law of the District of Columbia was established in *Robinson v. United States, supra*, which dealt with false representations in the sale of stock. In the classical definition of false pretenses for this jurisdiction, the court stated,

> The elements of the offense are a false pretense or false representation by the defendant *or someone acting for and instigated by him*, knowledge by the defendant as to the falsity, reliance on the pretense or representation by the person defrauded, intent to defraud and an actual defrauding.

42 App.D.C. at 192 (emphasis added). Culpability for misrepresentation by proxy is also confirmed by our statute's use of the word "procures" when it condemns the deceiver who "procures the . . . signature of any person, as maker . . . to or upon any . . . promissory note"—

---

11. The applicable statute at the time of *Jones* was The Penitentiary Act of 1831. *See* note 8 *supra*. Although different in form from our current statute, it bears the unmistakable imprint of the English statutes:

> [E]very person, duly *convicted* of obtaining, by false pretenses, any goods or chattels, money, bank-note, promissory note, or any other instrument in writing, for the payment or delivery of money or other valuable thing . . . ., shall be sentenced to suffer imprisonment and labor for a period not less than one year, nor more than five years.

*See Jones v. United States, supra* at 654, which notes "there can be no doubt that Congress had them [the English statutes] in view when they passed the penitentiary law for this district."

the very instrument obtained from Ms. Blair, the complaining witness at bar.[12]

## IV

The weight of authority in this country, as in England, heavily preponderates towards criminal liability for misrepresentation by proxy. In the leading case of *Boushea v. United States,* 173 F.2d 131 (8th Cir. 1949), the defendant-warehouser, intending that his misrepresentation be reiterated to the Department of Agriculture, told a farmer that his stored potatoes had fallen below grade, it being the defendant's scheme that the government would then issue a "dumping order" allowing the potatoes to be disposed of while the farmer received an appropriate credit on his government loan. In fact the potatoes conformed to grade specifications; and when the plan succeeded, the defendant proceeded to dispose of them at a profit. Although prosecuted for making a false claim against the government, the law of false pretenses was applied, and the transaction was viewed in terms of the defendant's knowing use of an "innocent agent" (the farmer) to repeat his false representation to the government. *Accord, People v. Mutchler,* 309 Ill. 207, 140 N.E. 820 (1923) (defendant instigates innocent bank customer to falsely represent defendant to bank as successful businessman); *State v. McCormick,* 57 Kan. 440, 46 P. 777 (1896) (purchase of horse by worthless check innocently represented by third person to be good).

Closely analogous is the oft-cited case of *Commonwealth v. Johnson,* 167 Ky. 727, 181 S.W. 368 (1916), where the defendant, having assigned his wages to the complaining witness, proceeded to collect them from his employer by falsely representing that there had been no assignment. Rejecting the argument that no false misrepresentation was

made to the assignee, the court held that the false pretenses statute (also modeled after the English version)

> does not require that the false statement should be made to any particular person or that it should be with the intention of committing a fraud upon the person to whom the statement was made. The offense is committed when the false statement is made, with the intention to commit a fraud, and money or property is thereby obtained.
>
> . . . . .
>
> The purpose of the statute is to punish the perpetrators of fraud committed through any false pretense. The gist of the offense is the successful misrepresentation, regardless of the person to whom it is made.

*Id.* at 733, 181 S.W. at 370. *Accord, State v. McDonald,* 534 S.W.2d 650 (Tenn.Sup.Ct.), *cert. denied,* 425 U.S. 955, 96 S.Ct. 1733, 48 L.Ed.2d 200 (1976) (misrepresentation to government official that clear and unencumbered title existed to automobile, thereby defrauding credit union); *Commonwealth v. Kiernan,* 348 Mass. 29, 201 N.E.2d 504 (1964), *cert. denied, sub nom. Gordon v. Massachusetts,* 380 U.S. 913, 85 S.Ct. 901, 13 L.Ed.2d 800 (1965) (defendant-construction engineer misrepresents completion of certain work to parking authority which thereupon authorizes bank trustee to make payment); *State v. Hargrave,* 103 N.C. 328, 9 S.E. 406 (1889) (defendant misrepresented to county clerk that he had not assigned witness fee); *Mack v. State,* 63 Ala. 138 (1879) (defendant misrepresents to *A,* who has *B's* musical instruments, that he was sent by *B* to retrieve the instruments); *Commonwealth v. Call,* 38 Mass. (21 Pick) 515 (1839) (defendant falsely represents to debtor that he is authorized to collect for creditor).[13]

---

12. As will be demonstrated *infra,* the language of *Robinson* requiring "reliance on the pretense or representation by the person defrauded" merely requires the fact of reliance, not that the reliance be produced in a particular manner, *i.e.,* by hearing the defendant utter the misrepresentation.

13. The only case squarely against the weight of authority is *Young v. State,* 22 Ala.App. 443, 116 So. 709 (1928), where the defendant was charged with falsely representing that he was a "specialist", but the evidence failed to show that he had made the statement to the alleged victim. Apparently overlooking the earlier case of *Mack v. State,* 63 Ala. 138 (1879), the

## V

Against this background, we may now consider whether *Foster v. Goldsoll*, 48 App. D.C. 505 (1919), departed from the mainstream by placing fraud by proxy outside of the District's false pretenses law. Bearing in mind that Judge Robb, who authored the opinion in *Foster*, also wrote the earlier opinion in *Robinson*, which read the statute to reach misrepresentation "by the defendant or someone acting for and instigated by him", this departure urged by the defendant must be entertained with initial skepticism. In *Foster*, the French government sought Goldsoll's extradition under a treaty which required that the asserted criminal charge constitute a crime under the law of the District of Columbia, *i. e.*, the false pretenses statute. The record showed that Pierce-Arrow Company had been unsuccessful in its efforts to sell trucks to the French government. Goldsoll was alleged to have represented to Pierce-Arrow's agent that (1) he was in a position to control orders placed by the French War Department for American trucks and (2) Pierce-Arrow would therefore have to deal with him in order to secure orders. Pierce-Arrow thereupon engaged Goldsoll and paid him a commission for the many trucks which it thereafter sold to France. France claimed that the representations to Pierce-Arrow were false, that Pierce-Arrow could have obtained orders without Goldsoll's intercession, and that the price to France was greater than it would have been without Goldsoll's commission.

On appeal, it was stated, "There is no evidence that Goldsoll made any representations whatever to [the Pierce-Arrow agent], or to anyone else." *Id.* at 531. However, even assuming a misrepresentation, the result would be no different:

If anyone was deceived, it was the Pierce-Arrow Company, and not the French Republic; for the commissions paid Goldsoll's firm in New York were not paid by that Republic, but by the company from money of which the company had absolute ownership. The theory of the prosecution is that . . . exactly the same number of trucks would have been purchased by the French government had the Goldsoll agency not intervened. It logically follows that no deception was practiced *upon that government*. It wanted Pierce-Arrow trucks, and it got what it wanted, at an agreed price.

*Id.* at 534 (emphasis added).[14] The critical language which generated the misunderstanding of *Foster's* holding then follows:

The contention here is that the alleged false pretenses were made to the Pierce-Arrow Company, and that the money was obtained "from the government of the Republic of France." The payments by France not having been induced by the false pretenses, the most essential element of the crime of false pretenses is lacking.

*Id.* at 535.

By stating that France's "payments" were "not . . . induced by the false pretenses" to Pierce-Arrow, the court turned the case upon the absence of the critical element (as laid down in *Robinson*) of "reliance on the pretense or representation by the person defrauded. . . ."[15] The fact, of course, was that France was ignorant of Goldsoll's claimed representation to Pierce-Arrow (that orders from France could only be gotten through Goldsoll). Reliance, therefore, was an impossibility.

*Foster* cannot stand for the proposition that the statute is not violated where false representations are communicated to a third person with the intent that they be

---

intermediate court of appeals rejected the doctrine that the crime could be accomplished by false pretense directed to a third party with the intention that it be repeated *to the ultimate victim*. The only exception *Young* permits is the misrepresentation made to a third party who is also the agent of the victim.

14. The court had elsewhere concluded that the price paid by the French government was the same price at which other purchasers acquired trucks without Goldsoll's intercession. *Id.* at 533, 535.

15. *Robinson v. United States, supra* at 192.

passed on to the victim who then, as the defendant originally contemplated, proceeds to rely upon the reiterated deceit. *Foster* is a simple case of proximate cause expressed through reliance. In the language of *The Queen v. Brown, supra* at 352, Goldsoll's alleged fraud was never shown to have "operated on the mind" of the French government.

■ It is clear the defendant cannot find refuge in *Foster.* The evidence here establishes beyond peradventure that the defendant made the false representations to Ruiz knowing that he was counseling Ms. Blair. The defendant intended that his misrepresentations influence Ruiz so that he would repeat the deceits to Blair and recommend that she sign the promissory note. Ruiz was the defendant's mouthpiece, an innocent alter ego through which the defendant perpetrated the fraud upon Blair. This is not a case of Blair being ignorant of defendant's representations. They were repeated to her just as the defendant intended; they shaped (1) Ruiz's advice that she sign the promissory note and (2) her decision to do so. The fraud was effected just as though the defendant were physically present. He cannot so easily escape the prohibition of the false pretenses statute by the artful use of an intermediary.

The statute lays its proscription upon anyone who "by any false pretense, with intent to defraud, . . . procures . . . the signature of any person, as maker . . . to or upon any . . . promissory note. . . ." It does not by its terms require privity of utterance. *Foster* did not gratuitously add such a gloss. To insinuate that gloss into the statute would create a loophole that would completely undermine it by the simple expedient of perpetrating the offense through an innocent intermediary.

Lord Kenyon's words retain their persuasiveness to this court. The false pretenses statute is "auxiliary to the law of morality. I do not feel an inclination to explain it away." *Young v. The King,* 3 T.R. 98, 102 (1789), quoted in *Jones v. United States, supra* at 653–54.[16]

---

16. The defendant's guilt may be rested on an alternative basis. After the March 25, 1977 misrepresentations were perpetrated through Ruiz, Ms. Blair appeared at Senate Dodge before the defendant who directed her into an office where, in the company of a salesman, she signed the promissory note and auxiliary papers. Since the defendant knew that his misrepresentations had been passed on to Ms. Blair and that she was there on that account, his directions that she execute the papers constituted a face-to-face reaffirmation and reindorsement of his earlier misrepresentations. *People v. Mutchler,* 309 Ill. 207, 212–13, 140 N.E. 820, 822 (1923); *State v. McCormick,* 57 Kan. 440, 445–46, 46 P. 777, 779 (1896).