# FOSTER *v.* GOLDSOLL.

EXTRADITION; SUFFICIENCY OF EVIDENCE; OBTAINING MONEY BY FALSE PRETENSE.

1. There must be substantial evidence tending to prove the guilt of an accused to justify his commitment for extradition. (Mr. Chief Justice SMYTH dissenting.)

2. One is not guilty of obtaining money by false pretenses under section 842 of the D. C. Code (31 Stat. at L. 1326, chap. 854), providing that whoever by any false pretense obtains from any person anything of value shall be imprisoned, where the false pretenses were not made to the person defrauded. (Citing *Robinson* v. *United States*, 42 App. D. C. 186; Mr. Chief Justice SMYTH dissenting.)

3. The head of a foreign firm charged with falsely representing to an automobile company that it could place no orders with a foreign government except through his firm, and thereby inducing such company to appoint him its agent, and so defrauding such government out of the money paid by it to such company to cover his commissions, is not shown to have committed the crime of obtaining money from such government by false pretenses, so as to justify his extradition, by evidence that such company, after unsuccessfully endeavoring to do business directly with such government, learned of the accused's firm and its favorable position in relation to the automobile department of such government to obtain orders for its princi-

NOTE.—For authorities passing on the question of necessity of making the false pretenses to the defrauded party or of intending to defraud a particular person, see note in L.R.A.1916D, 270

pals, made such firm its agent, and immediately through it obtained
an order for automobiles from such government; and that subse-
quently the accused persuaded the automobile company to increase
his firm's commissions to the amount it was receiving from other
auto manufacturers, and the usual commission allowed dealers, by
stating that he was in a position to control through the automo-
bile department of the foreign government the giving of orders for
automobiles.   (Mr. Chief Justice SMYTH dissenting.)

No.  3216.  Submitted February 5, 1919.  Decided March 31, 1919.

HEARING on an appeal from an order of the Supreme Court
of the District of Columbia, under habeas corpus, directing the
release of petitioner in an extradition proceeding.

                                              Affirmed.

The COURT in the opinion stated the facts as follows:

Appeal from an order of the supreme court of the District,
under habeas corpus, directing the release of the appellee Frank
Joseph Goldsoll, who was being held for extradition to France
as the result of proceedings under section 5270, R. S., founded
upon a complaint charging him with obtaining money from the
Republic of France by false pretenses.

The facts upon which the committing magistrate based his
ruling of probable cause are to be gleamed from depositions,
which constitute the sole evidence in the case.   They are sub-
stantially as follows:  In October and November of 1914 the
Pierce-Arrow Motor Car Company, of Buffalo, New York, a
large and responsible manufacturer of automobiles, was awarded
by the Republic of France contracts for 600 motor trucks, less
a discount from the catalogue or list price of 7½ per cent.   The
preliminary negotiations resulting in these awards were con-
ducted by the Bethlehem Steel Company, to which the Pierce-
Arrow Company quoted a discount of 20 per cent, including the
7½ per cent to be allowed the purchaser.   In other words, if the
Pierce-Arrow Company received 80 per cent of the list price, it
would realize its manufacturer's profit.   Before these awards
were made the Steel Company withdrew from the negotiations

and notified the Pierce-Arrow Company that it must deal directly with the French government. It resulted that the Pierce-Arrow Company received 92½ per cent of the list price under these early contracts. In January of 1915 two French officers, who represented the French government in this country in respect to the purchase of automobiles, asked the Pierce-Arrow Company for an option on its entire output, and the company tentatively acceded to their request. Almost immediately thereafter these officers were superseded here by the French Commission, which was located in New York city. The president of the Pierce-Arrow Company, in his examination by a special deputy attorney general of New York (presumably conducted for the purpose of ascertaining whether any law of that State had been violated) stated that his company made unsuccessful efforts to enter into negotiations with the Commission. He went to New York, but was unable even to see a member of the Commission. He did see the secretary, whose "answers were all noncommittal," and who said "they would send for me if they wanted to do anything." This situation continued until about the middle of the following March, when the company, according to its president, was "naturally a good deal on the anxious seat," because the tentative option it had given prevented it from getting other business. The proposition then was made to the Commission, through its secretary, for the furnishing of a certain number of two-ton trucks on a basis equivalent to 12½ per cent off the list price, but nothing came of this offer.

About March 20th the company decided to send its English agent, located in London, direct to the French Minister of War, in Paris, and endeavor to obtain an order there. Accordingly, the London agent of the company, Norris Perry, went to Paris, reaching there on Tuesday, March 23d. The cablegram from the company which contained his instructions directed him to offer the Minister of War 300 *five-ton* trucks at a discount of 15 per cent. Since Mr. Perry subsequently went down with the Lusitania, we must depend largely upon the statements of others as to what he did upon this occasion. Upon reaching Paris he

communicated with the Minister of War and was referred by
that official to a Mr. Nobel, who informed him "that no more
lorries (trucks) were desired and that *all purchases were* made
in New York." Thereupon Perry communicated with
Lieutenant Lumet, who had been connected with the French
Purchasing Commission in America in 1914 and who, Perry
had just learned, was then attached to the Ministry of War in
Paris. There is no testimony from Lumet in the record, but
Captain Soulage, of the French Automobile Service, in his
deposition states "that in the latter part of March, 1915, the
25th or 26th, so far as I can recall, Lieutenant Lumet came to
my office to introduce Mr. Norris Perry, European representa-
tive of the Pierce-Arrow Company." According to this witness
Perry "made certain offers for five-ton trucks" and was in-
formed that the government "had no need of five-ton trucks"
but that our service was in co-operation with the French Mis-
sion (in the United States) which was under instructions to
obtain two-ton trucks from the White, Packard, and Pierce-
Arrow Companies, but I am not sure I have given the names of
the manufacturers correctly." Nobel and Soulage were the
only representatives of the French government connected with
the automobile service seen by Perry. Nobel advised him that
*no more trucks were needed,* and Soulage states that he "never
promised Mr. Norris Perry any order whatsoever."

It was in these discouraging circumstances that Perry sought
out Heliopoulos, of whom he had learned the previous year
in London. The deposition of Heliopoulos is in the record.
He appears to have been engaged in various enterprises and was
acquainted with the appellee Goldsoll. Perry, after informing
him "that he had always failed with the Ministry of Armament
* * * that he could not succeed at the Ministry of the Arma-
ment," asked Heliopoulos whether anything could be done, and
was told that Heliopoulos would "feel out the situation" with
people he knew, and that Perry was to see him next day. There-
upon Heliopoulos went to 12 Tronchet street, the headquarters of
the firm of Goldsoll, De Vere, & Higgins, where he found "only
De Vere and Higgins." He asked De Vere what he thought of

the Pierce-Arrow truck, and was informed that "it is the leading American machine." Perry's interview then was explained, and De Vere and Higgins suggested that he be brought to their office. This was done the next day, when Higgins asked Perry if he was authorized to sign a contract granting an exclusive agency "for the duration of the war." Perry replied that he was, "but that in order to be more certain he was going to telegraph" his company. This interview must have taken place on the 25th, because Perry sent his cablegram for authorization on that day. The next day, or the day after, Perry returned to Goldsoll's office with the cable granting him authorization. Thereupon Perry, acting for his company, in a written communication addressed to Heliopoulos, confirmed the "verbal arrangement" theretofore made, and Heliopoulos became the French representative of the company, all commissions to be in the United States. Goldsoll was not present at the interview when it was determined that Perry should cable for specific authorization to make the contract, that is, when the "verbal arrangement" was entered into, but was present when that arrangement was confirmed. However, there is no evidence that he made any representations whatever to Perry. Heliopoulos says *Higgins informed him* that he, De Vere, and Goldsoll had discussed the terms of the contract between the sending of the cable and the signing of the contract, but it is certain that Goldsoll and Perry met upon only one occasion; that is, when the contract was signed. Goldsoll's firm was the Paris representative of several automobile companies, and Heliopoulos testified that Goldsoll said to him: "It is understood you have the contract, but we have the organization, office, personnel, and expenses. Give the benefit of your representation to Goldberg (president of the Goldsoll Traders Corporation), who is busy centralizing all automobile business," and you will have a named part of the profits. The French War Office was notified of this contract, and, in a communication to the Pierce-Arrow Company, that office acknowledged receipt of the notice.

After Perry's interview with Nobel and Soulage at the French War Office, he cabled his company in part as follows: "Minister

not requiring fives but twos cable me London best monthly de-
liveries discount and body prices by June 5th he requires my
firm offer immediately if accepted will cable American Commis-
sion place these orders with you.　*　*　*　"　Presumably after
Perry's interview with Heliopoulos, Higgins, and De Vere, he
sent a second cablegram to his company as follows: "Very large
orders are certain on same terms as before if allow trading house
here seven and value otherwise possibility business very un-
likely (stop) strongly advise you cable me instructions sign
commission letter this and future business immediate action
necessary (stop) cable here deliveries twos and fives April, May
June (stop) make no offer your side instructions will be sent
New York place orders with you presume my commission pay-
able."

There is no evidence connecting Goldsoll with these cable-
grams.　On the contrary, the first was undoubtedly sent before
Perry had even seen Heliopoulos, and the second before Perry
and Goldsoll were brought together, for the obvious reason that
their first meeting was not until after the answer to this cable-
gram was received by Perry.　It is contended on behalf of the
prosecution that something must have occurred between the
sending of the two cablegrams to convince Perry that it would
be necessary to interest Goldsoll's firm if business was to be
obtained.　We do not interpret the first cablegram as does
counsel for the prosecution.　Perry, as we have seen, had inter-
viewed two officials of the French War Office.　One of those
officials, Nobel, informed him that no more trucks were de-
sired, and that all purchases would be made in New York; the
other, Soulage, that the service "was in co-operation with the
French Mission, which was under instructions to obtain two-ton
trucks from the White, Packard, and Pierce-Arrow companies,"
but that he was not sure he had given the names of the manu-
facturers correctly.　He was certain that he "never promised
Mr. Norris Perry any order whatsoever."　That he did not
give the names of the companies correctly is clear from the fact
that an order subsequently given the Pierce-Arrow Company
necessitated the cancelation of a like order to the Packard Com-

pany. The most Perry could have hoped, therefore, when he sent the first cablegram was that he, a stranger in a strange land, could accomplish more for his company than its officials had been able to accomplish with the duly accredited representatives of the French government in the United States. In the circumstances, his hope must have been a forlorn one, born of unusual optimism.

Before discussing the second cablegram, it will be profitable to state what the record discloses concerning Goldsoll's firm. Colonel Cordier, who was chief of the automobile section in the French Ministry of War, testifies that he had frequent occasion to see De Vere, "as he represented, in addition to the Jeffry Company, the Pierce-Arrow, the Velie, and a certain number of American firms, the names of which I do not recall. De Vere, who was very obliging, was made use of for technical instructions, but never was any question of price discussed with him; at the most we asked him information as to the approximate price, which opinion we sent to our Mission in America." This witness also understood that Heliopoulos represented the Packard and Pierce-Arrow companies. In the deposition of Auguste Etringer, an assistant in Colonel Cordier's office, he says that De Vere came to their office "very frequently, and was indeed provided, I believe, with a permanent pass; I know that he was very well thought of, being very useful and having even made some slight repairs at the request of the service. It is certain that he has thus been able to acquire information regarding the needs of the armies, the knowledge of which might be useful for the companies for which he was acting, and thus enable them to present bids before any competitor. * * * " Captain Soulage, previously mentioned, says that in December of 1914 his office acknowledged the receipt of a communication from De Vere and Goldsoll, notifying that office of the appointment of these men as agents of the Jeffry Company. "As for the Pierce-Arrow," says the witness, "there was a commercial representative, who was M. Heliopoulos; as for De Vere, he told me he attended to the technical part, but, in fact, it was always he who gave information and who telegraphed to America

when we had need of any information. * * * He was of un-
doubted utility to us at the time of the transforming of the
Jeffry tractors for the information which he gave us regarding
the possibilities of the deliveries of the American firms. I add
that De Vere had a shop where he made repairs willingly"
(gratuitously).

It thus appears from the testimony of these French officers
that Goldsoll's firm was in a very strategic position with respect
to the purchase of automobiles required by the French Army.
Of course, Perry understood why he was sent to Paris. He
must have known that the officials of his company had been un-
able to secure any business between November and March; and
it is quite probable that, when he learned of the friendly rela-
tions existing between the French purchasing bureau and Gold-
soll's firm, he became convinced that through that firm his com-
pany would be almost certain to get business. Moreover, we
think the prosecution scrutinizes this second cablegram too
critically. It is common knowledge that agents, and particular-
ly those who are successful, usually express themselves in op-
timistic terms. Optimism is a part of their creed, and neces-
sarily so.

That Perry's advice was good is clear from what followed;
for a few days later, that is, on March 30th, he was able to
cable his company that an order for 300 two-ton trucks would
be placed within a few days. On the 5th of April, 1915, the
Pierce-Arrow Company notified the French Mission at New
York that, through its Paris representative, it had closed its
contract with the French War Office for the 300 two-ton trucks,
and that the terms, having been made in Paris, supplanted the
proposition previously made to the Mission. This order was
followed by several others.

Early in April of 1915, that is, immediately following his
trip to Paris, Perry came to the United States and reported to
the Pierce-Arrow Company, and particularly to its assistant
general manager, Mr. H. Kerr Thomas. Mr. Thomas, in his
examination by the deputy attorney general of New York, stat-
ed that Mr. Perry, in answer to a question as to the identity

of Heliopoulos, said he was "one of a syndicate, and the rest he believed were Americans." Asked if Perry mentioned Goldsoll, Higgins, or De Vere, he replied in the negative; that he mentioned no one in particular other than Heliopoulos. This witness was further asked what Perry said with reference to this syndicate, and replied: "Very little except to say that they seemed to have very good standing in Paris." Asked whether Heliopoulos made any explanation in regard to the ability of the syndicate "to control orders of the French government or procure them," he answered: "He (Heliopoulos) said he believed that this syndicate would be able to secure large business." Mr. Thomas also was asked whether he did not understand "that there was some reason which gave this syndicate especially a standing with the French government," and replied: "Only inasmuch as any agent to be of any use must stand in with the people he is trying to sell to. * * * Mr. Perry never made the slightest suggestion to me that any of these people were exercising any improper influence."

Goldsoll came to the United States in August of 1915, and on September 30th, following, held an interview with officials of the Pierce-Arrow Company in Buffalo. During his examination Mr. Thomas, who had made a memorandum of the interview, read therefrom in part as follows: "Mr. Goldsoll represents a large number of automobile makers in Paris, and for Pierce-Arrow automobiles he trades under the name of Heliopoulos to avoid the appearance of a monopoly, but his personal relations with the War Department (French) enable him to be in touch with all orders as they are placed." He further testified that Goldsoll then asked for an increase in his commission from $7\frac{1}{2}$ per cent to $12\frac{1}{2}$ per cent, which was agreed to and his contract modified accordingly. Later in the examination of Mr. Thomas there was read to him what purported to be an extract from his memorandum, as follows: "Mr. G. represents large number of American auto makers in Paris. For Pierce-Arrow autos trades under name of Heliopoulos to avoid appearance of monopoly, but his personal relations with War Department are such that no American trucks are purchased, otherwise

than through him." To this the witness answered: "I don't think I quite mean that. There are other firms supplying their trucks to France for whom he is not agent. What I think I meant was that he was in touch with all orders that were placed." The examiner then said: "What you mean is perfectly clear, that he stated to you that he was in personal relations with the War Department?" Answer; "Yes, sir." Question; "That he was in position to control through the War Department the giving of orders for American trucks?" Answer: "Yes, he said that." Mr. Thomas then was asked, "Has anything come to your attention which informed you what his particular association in the War Department might be," and replied: "Absolutely not." Mr. Henry May, vice president of the Pierce-Arrow Company, and present at this part of the interview with Goldsoll, testified that the increase was granted so as to make Goldsoll's compensation equal that allowed by other manufacturers. Asked what were the compelling motives that led his company to grant this increase, the witness said: "We were selling our trucks in this country at a 20 per cent discount to the dealers. We took it that we were perfectly willing to sell to this company (the Goldsoll Company) at the same discount. We figured to give the French government $7\frac{1}{2}$ per cent and the Alliance Motor Company (Goldsoll's) $12\frac{1}{2}$ per cent which would make the same commission as we give to our dealers here." Mr. May was examined with reference to the Thomas memorandum, and stated that he understood that "his (Goldsoll's) company over there knew what orders were being placed, and Mr. Goldsoll stated at the time that if the Pierce Company was not satisfied with their representation, at any time the Pierce Company felt it could get some representative over there who could get more business they would be ready to cancel the contract, and he assured us at the time that the next orders that were placed for American two and five-ton trucks the Pierce Company would get the contract." Question "He assured you that he could swing it, is that right? Answer: "Just as I stated, that we would get the next order or contract for two and five-ton trucks." Question: "I understand your

attitude. You are reluctant to admit that it was discussed Goldsoll's personal relations were going to be used to bring orders to the Pierce-Arrow Motor Car Company?" Answer: "I did not understand it that way." The statement of Goldsoll that he was receiving larger commissions from other companies represented by his firm is uncontradicted, and it also is undisputed that the increase of 5 per cent commissions allowed his firm did not, and was not intended to, affect the prices charged the French government.

Under date of November 24, 1915, Mr. Thomas for the Pierce-Arrow Company wrote Goldsoll's firm in New York and directed attention to statements contained in a letter received by the Pierce-Arrow Company from a man by the name of Williams, who then was in France. The Williams letter outlined a plan, then being perfected according to his statement, whereby parties in no way connected with Goldsoll's firm were to control the purchase of automobiles by the French government. Thomas requested an expression of opinion from the firm, "as the details given by our Mr. Williams and those which we had from you during our conversation with your principal so closely correspond." Thereupon C. Ettinger and A. Goldberg, for the Goldsoll Traders Corporation, replied: "We believe Mr. Williams has been imposed upon, as it appears to us the particulars are absolutely incorrect; further, wish to say you have misunderstood us if you think same corresponds to what we told you. * * * The agent who approached Mr. Williams was not connected with our people in any way. We are quite sure that the French authorities have never entered into a deal of this sort with anyone, neither have they or any one connected with them sought a commission or profit of any kind." In August and September of 1917, in letters to the French government, the Pierce-Arrow Company agreed "that in the event that we should not longer be obliged to pay in whole or in part this commission to the said Alliance Motors Corporation, such discharge of obligation being authorized by a written document executed by the Alliance Motors Corporation in a form satisfactory to us, we will reimburse you the entire sum

or the part of said commission from which we may have been freed from obligation to pay." Whether the French government succeeded in procuring the abrogation of the Goldsoll contract does not appear.

*Mr. John E. Laskey,* United States Attorney, *Mr. J. B. Archer,* and *Mr. Bolitha J. Laws,* Assistants, and *Mr. Benj. S. Minor,* for the appellant:

### Requirements for Extradition.

At the beginning of an analysis of this case it is appropriate to consider the requirements of the law necessary to extradite from the United States to France.

Section 5270 of the Revised Statutes of the United States provides, substantially, that upon complaint under oath charging the fugitive with having committed in the demanding country a crime mentioned in the treaty, a judge or commissioner may issue his warrant for the arrest of the fugitive, to the end that evidence of criminality may be heard; and if on such hearing he deems the evidence sufficient to sustain the charge under the treaty he shall certify the same to the Secretary of State, that warrant for the surrender of such fugitive may issue, and commit the fugitive to jail pending surrender.

Thus there is reposed in the judge or commissioner a discretion as to the sufficiency of the evidence: "If  *  *  *  he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty." He is the one, and the only one, who has power to pass upon the sufficiency of the evidence.

But he is not without some guidance and some limitations. They are to be found in the treaty between the United States and France, ratified June 27, 1911 (37 Stat. at L. 1526). Article I. provides that fugitives shall be delivered up only upon such evidence of criminality as, according to the laws of the place where the fugitive shall be found, would justify his apprehension and commitment for trial if the crime had been there committed. This means that the evidence must be such

as to justify commitment or holding to bail by a committing magistrate or police judge in the District of Columbia. It must consist of legal and competent proof of "probable cause."

Article 2, section 8, of the treaty provides that extradition shall be granted for obtaining money or property by false pretenses, "when such act is made criminal by the laws of both countries." It therefore is necessary to determine whether in this case the *"act"* is made criminal both under the laws of France and under the laws of the District of Columbia.

Briefly stated, then, the judge or commissioner before whom the case is heard must find, from legal and competent evidence, probable cause for holding that the fugitive committed the crime of false pretenses in France; and, further, that the acts of the fugitive are denounced as criminal alike by the United States and by France. If he so finds, the fugitive is committed to jail to await order of surrender from the Secretary of State.

Nowhere is any power specifically given to review the decision of the judge or the commissioner. But there are certain questions which may be determined upon *habeas corpus*. In short, they may be stated as follows:

1. Did the commissioner have jurisdiction of the subject-matter?

2. Did the commissioner have jurisdiction of the accused?

3. Did the facts before the commissioner constitute in law a crime covered by the treaty?

4. Were there facts proved before the commissioner which were susceptible in any aspect to a deduction of probable guilt?

No issue arises in the case at bar with respect to the two first questions. To the two last questions this appeal relates. First, there is disagreement as to the extent of the power to review upon the facts.

Power of Court to Review on Habeas Corpus the Decision of the Judge or Commissioner that the Facts Proved Are Sufficient to Make Out Probable Cause.

Justice Hitz, sitting as committing magistrate, under section

5270, Revised Statutes, decided that the facts proved before him made out a sufficient case of "probable cause" to justify Goldsoll's extradition.    Justice Gould, upon habeas corpus, found that the facts proved were inadequate to justify extradition.

How far is Justice Gould permitted to pass upon the facts before Justice Hitz?

He cannot act as an appellate court, nor can the writ of habeas corpus operate as an appeal or writ of error.

He cannot pass on the sufficiency of the evidence.    That is a matter entirely for the commissioner or judge sitting as committing magistrate.    Upon this point there is decided disagreement in this case.    Justice Gould conceived his powers included a determination of the sufficiency, or, as he termed it, the "adequacy" of the evidence.    Our position is the contrary.

He cannot require to have been produced before the committing magistrate evidence "beyond a reasonable doubt," or evidence to the exclusion of every hypothesis of innocence.

What he may do is briefly this: Search the record to determine if there was legal and competent evidence before the commissioner in any aspect of which the commissioner might find probable cause of guilt.    Put in order words: He must find there was produced *no* legal and competent evidence of probable cause in order to release on habeas corpus.

*Terlinden* v. *Ames,* 184 U. S. 270, 278: "The settled rule is that the writ of habeas corpus cannot perform the office of a writ of error, and that, in extradition proceedings, if the committing magistrate has jurisdiction of the subject-matter and of the accused, and the offense charged is within the terms of the treaty of extradition, and the magistrate, in arriving at a decision to hold the accused, has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision cannot be reviewed on habeas corpus.    *Ornelas* v. *Ruiz,* 161 U. S. 502, 508, and cases cited; *Bryant* v. *United States,* 167 U. S. 104.    "The statute in respect to the extradition gives no right of review by

any court or judicial officer, and what cannot be done directly cannot be done indirectly through the writ of habeas corpus."

*Ornelas* v. *Ruiz,* 161 U. S. 502, 509: "Whether an extraditable crime has been committed is a question of mixed law and fact, but chiefly of fact, and the judgment of the magistrate rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of evidence, and is final for the purposes of the preliminary examination unless palpably erroneous in law."

In the case just cited the district judge, upon habeas corpus, had released the accused because it was *his* judgment that the offenses were purely political in character. The Supreme Court said: "The district judge * * * arrived at a different result from that reached by the commissioner on the evidence on which the latter proceeded, and so was induced to substitute his judgment for that of the commissioner in whom was reposed the authority of decision, unless jurisdiction were lacking. "Can it be said that the commissioner had no choice on the evidence but to hold * * * that this was a movement in aid of a political revolt * * * and that acts which contained all the characteristics of crimes under the ordinary law were exempt from extradition because of the political intentions of those who committed them? In our opinion this inquiry must be answered in the negative."

Two points stand out from the quoted language of the *Ornelas Case, viz.*: First, The judgment of the magistrate cannot be reviewed on the weight of evidence; and, second, that to release on habeas corpus, the reviewing judge must find the commissioner had no choice on the evidence but to find lack of probable cause.

*Bryant* v. *United States,* 167 U. S. 104, 105: "The question before the commissioner in this case was whether in the language of the treaty * * * there was 'such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been there

committed.' In other words, whether, according to our laws, there was probable cause to believe him guilty of the crimes charged. * * * The question before us is even narrower than that, *viz.,* whether there was any legal evidence at all upon which the commissioner could decide that there was evidence sufficient to justify his commitment for extradition."

These cases alone distinctly establish the law, as applied to this case, that the judgment of Justice Hitz on the weight or sufficiency of the evidence cannot be reviewed. Nevertheless, Justice Gould on habeas corpus found as follows: "The testimony admissible and hearsay combined, is entirely too meagre and inadequate to enable me to reach the conclusion that Goldsoll made the representations set forth in the complaint."

The conception of the court as to his right so to test the evidence on habeas corpus, it seems, arose from certain language in the late case of *Bingham* v. *Bradley,* 241 U. S. 516. In that case the Supreme Court said: "The commissioner deemed the evidence sufficient to sustain the charge (Rev. Stat., sec. 5270), and since he had jurisdiction of the subject-matter and of the accused, and the offense is within the treaty, his finding cannot be reversed on habeas corpus if he acted upon competent and adequate evidence. *McNamara* v. *Henkel,* 226 U. S. 520, 523."

Did the language quoted change the rule of the Supreme Court theretofore uniformly pronounced, to the effect that the court cannot on habeas corpus pass upon the weight or sufficiency of the evidence? One impelling reason that it did not is apparent from the reference to the opinion in *McNamara* v. *Henkel,* supra, in support of the language quoted. At page 523 of the *McNamara* v. *Henkel* case the Supreme Court said: "The question simply is whether there was any competent evidence before the commissioner entitling him to act under the statute. The weight of the evidence was for his determination."

What is Probable Cause of Guilt?

Chief Justice Marshall, sitting as committing magistrate in

*Aaron Burr's Case,* case No. 14,692a, said: "On an application of this kind I certainly should not require that proof which would be necessary to convict the person to be committed on a trial in chief; nor should I even require that which would absolutely convince my own mind of the guilt of the accused; but I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the persons charged with having committed it."

Mr. Justice Washington, in the case of *Munns* v. *Dupont,* 3 Wash. C. C. 31, Fed. Cas. No. 9926, defined probable cause as "a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged."

The case of *United States* v. *Bloomgart,* Fed. Cas. No. 14,612, involved the measure of proof on preliminary hearing in a case of embezzlement. Upon the authority of Chief Justice Marshall's decision in the *Burr Case,* supra, Judge Blatchford held that evidence of a confession, without any proof of the corpus delicti, was sufficient evidence of probable cause.

These decisions exclude all debate with respect to requiring "proof beyond a reasonable doubt," and "proof to the exclusion of every hypothesis of innocence," and also "proof as to every element of the offense." The requirement of the evidence is that it shall afford "good reason to believe" the crime was committed.

Did the Facts Constitute in Law a Crime Covered by the Treaty?

The treaty between France and the United States provides:

Article I. "The government of the United States and the government of France mutually agree to deliver up persons who, having been charged with * * * any of the crimes or offenses specified in the following article, committed within

the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other * * * ".

Article II. "Extradition shall be granted for the following crimes and offenses: 8. * * * Obtaining money, valuable securities or other property by false pretenses, *when such act is made criminal by the laws of both countries.* * * * "

Applied to this case, there arises from the quoted language of article I. the question: Did Goldsoll within the jurisdiction of France commit the crime of false pretenses? And from the quoted language of article 2, there arises the question, Was the act of Goldsoll in obtaining money by false pretenses an act made criminal by the laws of the United States, as well as by the laws of France?

The claim is made on behalf of Goldsoll that no crime was committed within the jurisdiction of France as required by the treaty; but that, if committed at any point, it was committed in the United States. The basis of this claim is that the crime of obtaining money by false pretenses, according to the laws in force throughout the United States, is committed at the place where the money is obtained.

The following cases are to this effect: *Stewart* v. *Jessup,* 51 Ind. 413; *Com.* v. *Van Tuyl,* 1 Met. (Ky.) 1; *State* v. *House,* 55 Iowa, 466; *Simms* v. *State,* 28 Tex. App. 447; *State* v. *Shaffer,* 89 Mo. 271; *People* v. *Cummings,* 123 Cal. 269; *Connor* v. *State,* 29 Fla. 455.

They are authority for nothing more than the proposition that by the law of false pretenses in those particular jurisdictions the crime was completed where the money was obtained, and therefore the situs of the crime was fixed at that point.

More like Goldsoll's case is the case of *Strassheim* v. *Daily,* 221 U. S. 280, in which the Supreme Court of the United States held a man who commenced a crime in one jurisdiction (Michigan) and completed it in another (Illinois) could be extradited to the former: " * * * Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the

harm as if he had been present at the effect, if the State should succeed in getting him within its power. *Com.* v. *Smith,* 11 Allen, 256; *Simpson* v. *State,* 92 Ga. 41; *American Banana Co.* v. *United Fruit Co.* 213 U. S. 347, 356; *Com.* v. *Macloon,* 101 Mass. 1, 6, 18. We may assume therefore that Daily is a criminal under the laws of Michigan.

"Of course we must admit that it does not follow that Daily is a fugitive from justice. *Hyatt* v. *Corkran,* 188 U. S. 691, 712. On the other hand, however, we think it plain that the criminal need not do within the State every act necessary to complete the crime. If he does there an overt act which is and is intended to be a material step toward accomplishing the crime, and then absents himself from the State and does the rest elsewhere, he becomes a fugitive from justice, when the crime is complete, if not before. *Re Cook,* 49 Fed. 843; *Ex parte Hoffstot,* 180 Fed. 243; *Re Sultan,* 115 N. C. 57. For all that is necessary to convert a criminal under the laws of a State into a fugitive from justice is that he should have left the State after having incurred guilt there. *Roberts* v. *Reilly,* 116 U. S. 80, and his overt act becomes retrospectively guilty when the contemplated result ensues. Thus in this case offering the bid and receiving the acceptance were material steps in the scheme, they were taken in Michigan, and they were established in their character of guilty acts when the plot was carried to the end, even if the intent with which those steps were taken did not make Daily guilty before. *Swift* v. *United States,* 196 U. S. 375, 396."

In the State cases cited, stress is laid upon the fact that the gist of the offense of false pretenses is obtaining money. That is because the statute so makes it. Under the statute, it is not the crime of false pretenses simply to make false representations; that crime attaches when the money is obtained.

*Connor* v. *State,* 29 Fla. 455, supra. At page 475, the court says: "The receipt or obtaining of the property is the consummation of the offense, and in the absence of a valid qualifying statute, the place of its receipt is the sole locality of jurisdiction."

But suppose the statute or the law were otherwise. Suppose the legislature of a State passed a statute, as it unquestionably would have power to do (*Green* v. *State,* 60 Ala. 40; *Archer* v. *State,* 106 Ind. 42), making it a crime if a false pretense were made in that State and the money obtained at any point, whether inside or outside that State. Then suppose that State should demand extradition of one who had violated this statute. Can it be said, upon the authority of the cases holding the crime was committed in the jurisdiction where the money was obtained, that the State where the fugitive was found would refuse to deliver up the defendant? Obviously no. And the reason is that the law of the demanding State governs as to whether or not a crime has been there committed.

In *Webster* v. *Splain,* 45 App. D. C. 567, 574, this Court said: "Manifestly, the courts of this District will not in a habeas corpus proceeding to prevent extradition assume the jurisdiction which belongs exclusively to the courts of Illinois and determine the sufficiency of the complaint by a construction of the various statutes of that state touching the case."

And the Supreme Court cases are to the same effect: *Ex parte Reggel,* 114 U. S. 642, 651; *Kentucky* v. *Dennison,* 24 How. 66, 107.

The demanding country in the case at bar is France. When we wish to determine whether the crime was committed in France, we must look to her laws and decisions.

There is no question, but that Goldsoll may be tried in France for "escroquerie" if he made a false pretense in France and thereby obtained money in the United States.

But there is another provision of the treaty which invokes the laws of the United States. Section 8 of article 2 says extradition shall be granted in case of "obtaining money * * * by false pretenses, when such act is made criminal by the laws of both countries. * * *"

By decision of the Supreme Court, this language, so far as it relates to the laws of the United States, means the laws of the place where the fugitive is found. *Wright* v. *Henkel,* 190

U. S. 40.   Therefore the laws of the District of Columbia are brought into consideration.

This section means simply that the *acts* committed by Goldsoll shall be made criminal by the laws of the United States (or District of Columbia) without reference to local laws relating to venue and other like matters of procedure.

*Wright* v. *Henkel,* supra: "The general principle of international law is that in all cases of extradition the act done on account of which extradition is demanded *must be considered a crime by both parties,* and as to the offense charged in this case the treaty of 1889 embodies that principle in terms.   The offense must be 'made criminal by the laws of both countries.' * * * Where there was reason to doubt whether the generic term embraced a particular variety, specific language was used. As for instance, as to the slave trade, though criminal, yet, apparently because there had been peculiar local aspects, the crime was required to be 'against the laws of both countries;' and so as to fraud and breach of trust, which had been brought within the grasp of criminal law in comparatively recent times. But it is enough if the particular variety was criminal in both jurisdictions, and the laws of both countries included the laws of their component parts."

In addition to this, there is another provision of the treaty between France and the United States which supports the argument of the government.   Article 8 reads as follows: "Extradition shall not be granted, in pursuance of the provisions of this convention, if the person claimed has been tried for the same act in the country to which the requisition is addressed, * * *."

Is it the Crime of False Pretenses in the District of Columbia to Make a Representation to One Person and Obtain the Money of Another Person?

The acts of Goldsoll constitute the crime under the French law, which corresponds to the crime of false pretenses under the laws of the United States.

Code, sec. 842.   *"False Pretenses.*   Whoever, by any false pretense [not to any particular person] with intent to defraud

[not any particular person] obtains from any person [not any particular person] anything of value * * * shall * * * be imprisoned," etc.   [Parentheses supplied.]

At the outset, there are three decisions of this court, which are typical of all the other cases relied upon by Goldsoll, and whose just elimination from the discussion simplifies the controverted proposition.   They are: *Partridge* v. *United States,* 39 App. D. C. 571; *Talbert* v. *United States,* 42 App. D. C. 1; *Robinson* v. *United States,* 42 App. D. C. 186.

D. C. Code, section 917: *"Intent to Defraud.*   In any indictment in which it is necessary to allege an intent to defraud, it shall be sufficient to allege that the party accused did the act complained of with intent to defraud, without alleging an intent to defraud any particular person or body corporate; and on the trial of such an indictment it shall not be necessary to prove an intent to defraud any particular person, but it shall be sufficient to prove a general intent to defraud."

It is sufficient if a false representation, effective to defraud, is designedly made to a person other than the defrauded party whose property, as a result, is fraudulently obtained.   *Com.* v. *Call,* 21 Pick. 515; *Com.* v. *Johnson,* 167 Ky. 727, L.R.A. 1916D, 267.

See also *Adams* v. *People,* 1 N. Y. 178; *Archer* v. *State,* 106 Ind. 42; *Berry* v. *State,* 10 Ga. 518; *Bingham* v. *Bradley,* 241 U. S. 516; *Bishop* v. *State,* 30 Ala. 40; *Bryant* v. *United States,* 167 U. S. 104, 105; Aaron Burr's Case, Fed. Cas. No. 14,692a; *Collins* v. *State,* 3 Heisk. 18; *Com.* v. *Call,* 21 Pick. 515; *Com.* v. *Dennison,* 24 How. 66, 107; *Com.* v. *Hill,* 11 Mass. 136; *Com.* v. *Johnson,* 167 Ky. 727; *Com.* v. *Van Tuyle,* 1 Met. (Ky.) 1; *Com.* v. *Warren,* 6 Mass. 72; *Connor* v. *State,* 29 Fla. 455; *Cross* v. *Peters,* 1 Me. 388; *Glucksman* v. *Henkel,* 221 U. S. 512; *Graham* v. *People,* 181 Ill. 488; *Green* v. *State,* 60 Ala. 40; *Gregory* v. *State,* 26 Ohio St. 514; *Grin* v. *Shine,* 187 U. S. 181; *Re Herres,* 33 Fed. 167; *Mack* v. *State,* 63 Ala. 138; *McNamara* v. *Henkel,* 226 U. S. 520, 523; *Munns* v. *Dupont,* 3 Wash. C. C. 31, Fed. Cas. No. 9926; *Ornelas* v. *Ruiz,* 161 U. S. 502, 509; *Partridge* v. *United States,* 39 App. D. C. 571;

*Patterson* v. *United States,* 39 App. D. C. 91; *People* v. *Cummings,* 123 Cal. 269; *People* v. *Rice,* 13 N. Y. Supp. 161, 128 N. Y. 649; *Rand* v. *Com.* 176 Ky. 343; *Ex parte Reggel,* 114 U. S. 642, 651; *Reg.* v. *Bannen,* 2 Moody, C. C. 391; *Reg.* v. *Clifford,* 61 Eng. Com. L. Rep. 202; *Rex* v. *Giles,* 1 Moody, C. C. 169; *Reg.* v. *Mazeau,* 38 Eng. Com. L. Rep. 394; *Reg.* v. *Michael,* 2 Moody, C. C. 163; *Robinson* v. *United States,* 42 App. D. C. 186; *Schayer* v. *People,* 5 Colo. App. 75; *Simms* v. *State,* 28 Tex. App. 447; *State* v. *Bourne,* 86 Minn. 432; *State* v. *House,* 55 Iowa, 466; *State* v. *Learned,* 41 Vt. 589; *State* v. *Shaeffer,* 89 Mo. 271; *State* v. *Shurtliff,* 18 Me. 371; *Sternaman* v. *Peck,* 80 Fed. 883; *Stewart* v. *Jessup,* 51 Ind. 413; *Strassheim* v. *Daily,* 221 U. S. 280; *Talbert* v. *United States,* 42 App. D. C. 1; *Terlinden* v. *Ames,* 184 U. S. 270, 278; *United States* v. *Bloomgart,* Fed. Cas. No. 14,612; *United States* v. *Green,* 146 Fed. 766; *Webster* v. *Splain,* 45 App. D. C. 574; *Wright* v. *Henkel,* 190 U. S. 40, 58, 60.

*Mr. Wilton J. Lambert, Mr. Jos. W. Bailey,* and *Mr. J. J. Darlington,* for the appellee, in their brief cited:

*Ball* v. *United States,* 140 U. S. 118; *Bates* v. *State,* 124 Wis. 612; *Bingham* v. *Bradley,* 241 U. S. 511; *Brackett* v. *Griswold,* 112 N. Y. 454; *Bryant* v. *United States,* 167 U. S. 104; *Com.* v. *Taylor,* 105 Mass. 172; *Featherston* v. *People,* 82 N. Y. 238; *Gluckman* v. *Henkle,* 221 U. S. 512; *Graham* v. *People,* 181 Ill. 477; *Grinn* v. *Shine,* 187 U. S. 181; *Re Hawkes,* 204 Fed. 309; *Re Herres,* 33 Fed. 167; *Jones* v. *Simpson,* 116 U. S. 609; *King* v. *Benedict,* 4 Barn. & A. 179; *McNamara* v. *Henkel,* 226 U. S. 520; *Norris* v. *State,* 25 Ohio St. 217; *Ornelas* v. *Ruiz,* 161 U. S. 502; *Partridge* v. *United States,* 39 App. D. C. 571; *Pearson* v. *McGowan,* 3 Barn. & C. 700; *People* v. *Adams,* 3 Denio, 190; *People* v. *Bough,* 1 N. Y. Supp. 298; *People* v. *Miller,* 169 N. Y. 339; *People* v. *Razesiz,* 206 N. Y. 249; *Quill* v. *Wolff,* 4 Mackey, 188; *Reg.* v. *Larner,* 14 Cox, C. C. 497; *Reg.* v. *Sans Garrett,* 6 Cox, C. C. 260; *Reg.* v. *Jones,* 15 Cox, C. C. 475; *Reg.* v. *Mills,* 7 Cox, C. C. 263;

*Roberts* v. *Reilly*, 116 U. S. 80; *Robinson* v. *United States*, 42 App. D. C. 192; *State* v. *Cuball*, 57 Wash. 21; *State* v. *Heinse*, 5 Iowa, 466; *Re Stephenson*, 67 Kan. 556; *Sternaman* v. *Peck*, 80 Fed. 883; *Stewart* v. *Jessup*, 51 Ind. 415; *Strassheim* v. *Daily*, 221 U. S. 280; *Terlinden* v. *Ames*, 186 U. S. 279; *United States* v. *Bloomgart*, Fed. Cas. No. 14,612; *United States F. & G. Co.* v. *Des Moines Bank*, 145 Fed. 873; *United States* v. *Simmons*, 96 U. S. 364; *Webster* v. *Splain*, 45 App. D. C. 567; *Wright* v. *Henkle*, 190 U. S. 40.

Mr. Justice Robb delivered the opinion of the Court:

The complaint against Goldsoll is in three counts, the first charging that on March 25, 1915, in Paris, with intent to defraud the Republic of France, he fraudulently did pretend and represent to the Pierce-Arrow Motor Car Company, through its agent Norris Perry, "that no order or orders for the purchase in the United States of America of automobile trucks could be obtained from the French government except through an agency established in the city of Paris * * * and the payment to said agency of certain sums of money as commissions on all orders placed with the company, and that the relations of him, the said Frank Joseph Goldsoll, with the War Department of the French government, were such that he, the said Frank Joseph Goldsoll, was in position to control the giving of orders for American automobile trucks; and by the employment of said false and fraudulent pretenses and representations, the said Frank Joseph Goldsoll unlawfully * * * and with intent to defraud the Republic of France did induce the said Pierce-Arrow Motor Car Company, in reliance upon said false and fraudulent pretenses and representations, to designate him, the said Frank Joseph Goldsoll, under the name of Elie Heliopoulos, as agent and representative in the city of Paris, Republic of France, of the said Pierce-Arrow Motor Car Company; and thereby the said Frank Joseph Goldsoll between the 9th day of July, 1915, and the 31st day of December, 1917, did obtain from the government of the Republic of France the

sum of, to wit, $1,563,104.84,  *  *  *  the money and property of the said Republic of France, in the manner following; that is to say, the said money was part of the payment made by the said Republic of France to the Pierce-Arrow Motor Car Company for certain automobile trucks purchased from said Pierce-Arrow Motor Car Company by said Republic of France, the cost of which said automobile trucks to the said Republic of France had been burdened so as to include the amount of the commissions to be paid to said Frank Joseph Goldsoll,  *  *  * which said sum of money as commissions, the said Pierce-Arrow Motor Car Company did pay to the said Goldsoll; whereas, in truth and in fact orders for the purchase in the United States of America of automobile trucks could be obtained from the French government without an agency established in the city of Paris  *  *  *  and without the payment of certain sums of money as commissions on orders for the purchase of automobile trucks by the said Republic of France;" that Goldsoll was not in position to control the giving of orders, and that "at the time of the making by him of such false and fraudulent pretenses and representations aforesaid and the obtaining by him of money as aforesaid," he well knew the said representations to be false and fraudulent. The second count does not differ from the first materially, and the third count charges an attempt, so that we are concerned with the first only.

That count in effect charges Goldsoll with the making of false representation to the Pierce-Arrow Motor Car Company, through its agent Perry, which induced that company to appoint him its agent and to pay him certain commissions, and that he *thereby obtained from the government of the Republic of France* the amount named, being money of that government.

"Obtaining money, valuable securities, or other property by false pretenses" is made criminal by the laws of both the United States and France, and therefore is an extraditable offense under the treaty of July 26, 1911, between the two countries. 37 Stat. at L. 1526. Under article 1 of that treaty the contracting parties agree to deliver up persons who, having been charged with or convicted of any extraditable offense within the

jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territory of the other, "provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been there committed." It results, therefore, that the question of the guilt of Goldsoll must be determined with reference to the laws of the District of Columbia.

Section 842 of our Code (31 Stat. at L. 1326, chap. 854) provides that "whoever, by any false pretense, with intent to defraud, obtains from any person anything of value," shall be punished. In *Robinson* v. *United States,* 42 App. D. C. 186, this court in interpreting the statute said: "The elements of the offense are a false pretense or false representation by the defendant or someone acting for and instigated by him, knowledge by the defendant as to the falsity, reliance on the pretense or representation by the person defrauded, intent to defraud and an actual defrauding." The justice who sat as a committing magistrate was of opinion that "the record as presented to me (him) shows a sufficient ground for a judicial investigation of his (Goldsoll's) guilt by a court competent to make it." The justice whose decision we now review reached the opposite conclusion. The question before us is whether there was presented to the committing magistrate "competent and adequate evidence" that a crime had been committed by the appellee Goldsoll. *Bingham* v. *Bradley,* 241 U. S. 511, 60 L. ed. 1136, 36 Sup. Ct. Rep. 634. Of course, the writ of habeas corpus is of much narrower scope than a writ of error, but it would be valueless, indeed, did it not permit a reviewing court to determine whether, under the laws of the land, there is *substantial evidence* tending to prove the guilt of the accused. Our sense of obligation to foreign powers under extradition treaties ought not to outweigh our sense of duty to the accused and cause us to surrender him "in violation of those well-settled principles of criminal procedure which from time immemorial have characterized Anglo-Saxon jurisprudence. Persons

charged with crime in foreign countries, who have taken refuge here, are entitled to the same defense as others accused of crime within our own jurisdiction." *Grin* v. *Shine*, 187 U. S. 181, 47 L. ed. 130, 23 Sup. Ct. Rep. 98, 12 Am. Crim. Rep. 366.

We come now to an analysis of the record before us. We use the term "record" advisedly, for much of the matter therein is not evidence in any real or legal sense, although counsel for the accused throughout have not sought to stand upon technicalities; nor shall we. The Pierce-Arrow Company is one of the large and reputable automobile firms of the United States. In common with most American firms it sought to supply the Allied governments with its output, and in October and November of 1915 obtained certain orders from the Republic of France. There followed, according to the evidence and the finding of the committing magistrate, "a lean period, several months, and which the Pierce Arrow Company spent in watchful waiting." It was impossible even to obtain an interview with the French Purchasing Commission in New York. The situation apparently was hopeless. Mr. Perry was directed to proceed from London to Paris and get in touch with the French War Office. He carried out instructions, but without success. Of the two men he saw in that office, one, as we have seen, informed him that no more trucks were needed, while the other says he never promised him "any order whatsoever." Mr. Perry then saw Heliopoulos, who in turn saw Higgins and De Vere of Goldsoll's firm, and later a "verbal arrangement" was entered into between Perry, Heliopoulos, Higgins, and De Vere looking to the appointment of Heliopoulos as the Paris representative of the Pierce-Arrow Company. Up to this time Perry had neither seen nor heard of Goldsoll, so far as this record discloses. He certainly had not seen him. Perry cabled for authorization, and he then saw Goldsoll for the first time. There is no evidence that Goldsoll made any representations whatever to him, or to anyone else. The complaint is against Goldsoll and does not charge a conspiracy. Whatever representations may have been made, therefore, by De Vere and Hig-

gins (and there is no evidence as to any improper representations by them) are not chargeable to Goldsoll, as there is no evidence that Goldsoll had even heard of Perry until after the verbal arrangement was entered into.   We already have sufficiently analyzed the two cablegrams which, in our view, have assumed an importance in the case all out of keeping with their terms.   The evidence is convincing that Goldsoll did not even meet Perry until a day or two after the second cablegram was sent, and there is no evidence that either cablegram ever was brought to the attention of Goldsoll.   Upon what theory, therefore, it may be said that they constitute evidence against him is not apparent to us.   But, be that as it may, there is nothing suspicious in either of the cablegrams or inconsistency between them.   And at this point it may be observed that in a criminal case the accused is entitled, where two interpretations are open, to that consistent with innocence.   This case throughout seems based upon unrelated and unwarranted suspicions, from which strained inferences have been deduced.  The French War Office knew that Goldsoll's firm represented a considerable number of automobile firms, and it does not appear that the propriety thereof ever was questioned.   From the testimony of the officers of the French Automobile Service it is apparent that the firm was in a favorable and apparently unique position to obtain orders for its principals.   That business was obtained by the Pierce-Arrow Company immediately after Goldsoll's firm became its agent must be admitted, indeed is not denied. Here, again, in the face of admitted facts, we are asked to find that Goldsoll had nothing to do with obtaining these orders; in other words, that the Pierce-Arrow Company would have obtained the business anyway.   We think the logical inference deducible from the facts is to the contrary.   But, even assuming that Goldsoll's firm did nothing, it is not for the French government to complain, since the Pierce-Arrow Company saw fit to enlist the services of Goldsoll, and is not now complaining.

Much is attempted to be made of the supplemental contract between the Pierce-Arrow Company and Goldsoll under date of September 30, 1915, but in our view there is nothing unusual

about that contract. The commission Goldsoll's firm had been receiving was less than that voluntarily offered the Bethlehem Steel Company, and, on the uncontradicted evidence, less than the firm was receiving from other manufacturers. It was not strange, therefore, that Goldsoll should suggest that this discrimination be removed, and nothing more than that was done. The commission provided in the supplemental contract was the usual commission allowed American dealers. Notwithstanding the apparent attempt in the examination of Mr. Thomas of the Pierce-Arrow Company to have him express an opinion inconsistent with that really entertained by him concerning the interview with Goldsoll in September of 1915, we think a fair reading of his entire testimony makes it very clear that his understanding of the interview did not differ from that of Vice President May of the same company; namely, that the Goldsoll firm, being in touch with the purchasing department of the French War Office, was in a good position to get business. We have seen that De Vere of the Goldsoll firm, possessed the entire confidence of that office. Therefore Goldsoll's statement was not an extravagant one. The complaint involves the March, and not the September, contract; but, assuming the relevancy of the latter contract on the ground of intent, it adds nothing to the case, because it discloses no wrongdoing, or even suspicion of wrongdoing, on the part of any one.

We attach very little importance to the correspondence between the Pierce-Arrow Company and Goldsoll's firm concerning the Williams letter of November, 1915. In the first place, there is no evidence that this correspondence ever came to the attention of Goldsoll, and, in the second, his firm very promptly repudiated any connection with the parties who had furnished Williams his information. Not content with that, Goldsoll's firm very clearly and emphatically stated "that the French authorities have never entered into a deal of this sort with anyone, neither have they or any one connected with them sought a commission or profit of any kind." And this to the officials of the company to whom it is charged Goldsoll, the head of the same firm, had represented exactly the contrary for the purpose of

being appointed its agent. In other words, this statement is inconsistent with the charge against Goldsoll.

Viewed from any angle we can find no "competent and adequate evidence" (which, as we understand, means substantial evidence), in support of the charge against Goldsoll. The complaint is that false representations were made *to the Pierce-Arrow Company* and that the money was obtained *from the French government*. The contract of purchase was between the Pierce-Arrow Company and that government. Payments by the government were to that company in this country, and these payments of course included the commissions here involved. ·In short, it was the usual and customary arrangement. The Pierce-Arrow Company then paid its agent here. If anyone was deceived, it was the Pierce-Arrow Company, and not the French Republic; for the commissions paid Goldsoll's firm in New York were not paid by that Republic, but by the company from money of which the company had absolute ownership. The theory of the prosecution is that no agency was necessary. In other words, that exactly the same number of trucks would have been purchased by the French government had the Goldsoll agency not intervened. It logically follows that no deception was practised upon that government. It wanted Pierce-Arrow trucks, and it got what it wanted, at an agreed price. But it knew that an agency did intervene, and that knowledge came to it immediately following the creation of the agency. Since commissions are usually considered a necessary incident of agency, it is somewhat strange that more than two years should have elapsed before any effort was made to deal directly with the Pierce-Arrow Company. Of course, that company would have been perfectly willing to eliminate the agency, but, having unsuccessfully tried direct dealings, it ought not now to be convicted of bad faith by a finding based upon pure suspicion that it made a correct bargain with Goldsoll.

The prosecution cites *Com.* v. *Call,* 21 Pick. 515, 32 Am. Dec. 284; *State* v. *Hargrave,* 103 N. C. 328, 9 S. E. 406, and *Com.* v. *Johnson,* 167 Ky. 727, L.R.A.1916D, 267, 181 S. W. 368, each of which we have examined.

These cases are authority for the proposition that if one person makes a false statement to another and obtains *from that other person* money, the crime of false pretenses has been committed even though the loss falls upon a third person, but that is not this case.   The contention here is that the alleged false pretenses were made to the Pierce-Arrow Company, and that the money was obtained "from the government of the Republic of France." The payments by France not having been induced by the false pretenses, the most essential element of the crime of false pretenses is lacking.   And it was not possible for the prosecution to avoid the creation of this illogical situation; for had it been alleged that Goldsoll obtained the money from the Pierce-Arrow Motor Car Company, obviously his extradition to France could not have been accomplished.

The Pierce-Arrow Company endeavored to do business direct with the French government.   It was unsuccessful, and, exercising its undoubted right, it appointed an agent and paid that agent usual and reasonable commissions.   Of course the price to the French government was "burdened" with those commissions, but that is true of all sales, and because that government now is convinced that it should not have permitted an agency to intervene is no ground for holding Goldsoll, whose firm succeeded where its principal failed, guilty of a crime.   We fully concur in the able opinion of the justice, whose decision we now affirm, with costs.                            *Affirmed.*

Mr. Chief Justice SMYTH dissenting:

For the reasons which I am about to state I am unable to concur in the opinion just announced.

Goldsoll is charged with obtaining from the Republic of France $1,563,104.84 by means of false representations made by him to the Pierce-Arrow Company.   It is conceded that the offense charged must be denounced by the law of the District of Columbia.   Section 842 of our Code [31 Stat. at L. 1326, chap. 854] provides that "whoever by any false pretense, with intent to defraud, obtains from any person anything of value * * *

shall * * * be imprisoned." There is nothing in this
which requires the false pretense to be made to the person de-
frauded. To say that there is would require that we read into
the section a limitation which Congress did not place there.
Our duty is to enforce the law as we find it, not to mold it to suit
our convictions as to what it should be. True, in the *Robinson
Case,* 42 App. D. C. 186, referred to by the majority, this court
held that the representations must be made to the person de-
frauded, but I think the holding was *obiter,* for the reason that
the question was not presented for consideration, it being admit-
ted that the representations in that case were made to the person
who was defrauded.

Other courts have dealt with the subject under a statute
similar to ours. A person was charged in Massachusetts with
having defrauded another by false pretenses made to a third
person. Speaking of the indictment the supreme judicial court
of the commonwealth said: "A combination of facts has here
occurred and may occur again, where a deception has been prac-
tised upon one person, and his property obtained, and the loss
has fallen upon another, the intention being to defraud him.
This is clearly within the mischief intended to be guarded
against, and, we have no doubt, within the effective prohibition
of the statute." *Com.* v. *Call,* 21 Pick. 515, 520, 32 Am. Dec.
284. A Kentucky statute provides that "if any person by any
false pretense, statement, or token, with intent to commit a
fraud, obtain from another money, property, or other thing,
which may be the subject of larceny, * * * he shall be
confined," etc. Commenting upon the supreme court of the
state said: "The statute does not require that the false state-
ment should be made to any particular person, or that it should
be with the intention of committing a fraud upon the person
to whom the false statement was made. The offense is com-
mitted when the false statement is made with the intention to
commit a fraud, and money or property is thereby obtained."
*Com.* v. *Johnson,* 167 Ky. 727, L.R.A.1916D, 267, 181 S. W.
368.

In *State* v. *Hargrave,* 103 N. C. 328, 9 S. E. 406, it appeared

that one Hargrave had a claim against the county for witness fees which he assigned to Clodfelter. He then went to Kinney, the court officer authorized to pay the claim, represented that he was still the owner of the claim, and obtained the money thereon. Charged with obtaining from Kinney money by false pretense with the intent to defraud Clodfelter, he was convicted and the conviction upheld by the supreme court, which said "that the making of a false representation to one person so as to defraud another constituted an indictable offense, under the statute." The accomplished fraud must have reasonable connection with the pretense (Bishop, Statutory Crimes, sec. 452), and the pretense must be shown to be false, and made with intent to injure or defraud. Defraud whom? The statute does not in terms inform us. Usually the intent is to defraud the owner of the thing obtained; but it is sufficient if the intent be to defraud anyone connected with the ownership, possession, or custody of the chattel." *Mack* v. *State,* 63 Ala. 138, 140. I think the indictment clearly charges a crime under the laws of the District of Columbia.

Before proceeding to consider the evidence I think it proper to inquire by what rule, according to the decisions of the Supreme Court of the United States, we should be guided in our investigation. As I read those decisions, if there was *any legal* evidence of Goldsoll's guilt submitted to Mr. Justice Hitz, sitting as a committing magistrate, the case must be reversed and the writ of habeas corpus discharged. That court has said that in a habeas corpus proceeding the judgment of the committing magistrate cannot be reviewed "on the weight of evidence "(*Ornelas* v. *Ruiz,* 161 U. S. 502, 509, 40 L. ed. 787, 789, 16 Sup. Ct. Rep. 689) ; that unless it can "be said that the commissioner had no choice on the evidence but to" (id. 511) discharge the accused he is not entitled to the writ; that the judgment of the commissioner cannot be reviewed if "there was *any* legal evidence at all upon which the commissioner could decide that there was evidence sufficient to justify his commitment for extradition" (*Bryant* v. *United States,* 167 U. S. 104, 105, 42 L. ed. 94, 95, 17 Sup. Ct. Rep. 744) ; that "the ques-

tion simply is whether there was *any* competent evidence before the commissioner entitling him to act under the statute. The weight of the evidence was for his determination." [Italics mine.] *McNamara* v. *Henkel,* 226 U. S. 520, 523, 57 L. ed. 330, 332, 33 Sup. Ct. Rep. 146. This decision is followed in *Bingham* v. *Bradley,* 241 U. S. 511, 517, 60 L. ed. 1136, 1140, 36 Sup. Ct. Rep. 634. In the last case the court said that the finding of the commissioner could not be reversed "if he acted upon competent and adequate evidence," I do not think the court intended by the use of the word "adequate" to reverse its previous holdings. "Any legal evidence" is adequate. See also *Strassheim* v. *Daily,* 221 U. S. 281, 55 L. ed. 735, 31 Sup. Ct. Rep. 558. Little weight is given in proceedings upon habeas corpus to those. niceties of reasoning which may find effective play on the trial of a criminal case. *Glucksman* v. *Henkel,* 221 U. S. 508, 512, 55 L. ed. 830, 833, 31 Sup. Ct. Rep. 704. In the *Strassheim Case* the court in denying the application for the writ said disparingly that "considerable ingenuity was spent in pointing out defects that would occur to no one outside the criminal law," and objections which "savored of technicality" were rejected in the *Bingham Case.*

Following, then, the rule announced by the Supreme Court of the United States in the foregoing decisions, it seems to me that our duty is to search the record carefully, not for the purpose of determining whether or not we can find sufficient evidence which, if believed by the magistrate, would have warranted him in discharging the accused, but for the purpose of ascertaining whether or not the holding of the magistrate is supported by "any legal evidence;" and here, as I understand the opinion of the majority, is where my associates and myself part company. This is well illustrated by the majority opinion, wherein it is said "that in a criminal case the accused is entitled, where two interpretations are open, to that consistent with innocence." If the testimony is open to two interpretations, the examining magistrate may take his choice, and we have no power under the decisions which I have just quoted to review his action.

Perry at the instance of the Pierce-Arrow Company arrived in Paris on March 23, 1915, for the purpose of obtaining orders from the French Minister of War for five-ton automobile trucks, upon which he was authorized to make a discount of 15 per cent from the list price.  He soon learned that five-ton trucks were not then needed, but that possibly two-ton trucks might be, and if they were they would be purchased in New York.  The next day he sought the aid of Heliopoulos, who told him that he would see what could be done.  Soon thereafter Heliopoulos went to the firm of Goldsoll, 12 Rue Tronchet, where he found De Vere and Higgins.  He told them of Perry's visit, and they said, "bring him, there is perhaps something to be done." He brought him to Goldsoll's office but did not remain.  On this point he testified; "I have simply brought him to 12 Rue Tronchet, and I have been present at none of the interviews that they have had together."  What took place at this meeting or who was there we do not know, except by inference.  Heliopoulos said that Higgins told him that he, Higgins, "asked Mr. Perry if he was authorized to sign a contract granting to us the exclusiveness for the duration of the war."  The answer was that he had authority, but "for more certainty he was going to telegraph."  This testimony is purely hearsay and should not be considered.  It is not "legal evidence."  *Bingham* v. *Bradley,* 241 U. S. 517, 60 L. ed. 1140, 36 Sup. Ct. Rep. 634, supra.

The meeting between Perry and those who were present at Goldsoll's office, it appears, took place on March 26th.  At 9:40 A. M. of that day he cabled his company that the French government did not require any five-ton trucks, and asked the company to give him at London "best monthly deliveries, discount, and body prices by June 5.  He [the French Minister of War] needs my firm offer immediately. If accepted, will cable American Commission place order with you."  This cablegram must have been sent prior to the meeting at Goldsoll's office; for at 1:55 on the same day and after the meeting he cabled to his company: "Very large orders are certain on same terms as before if allow trading house here seven and value otherwise pos-

sibility business very unlikely. Strongly advise you cable me instructions sign commission letter this and future business immediate action necessary. Cable here deliveries twos and fives April, May, June, make no offers your side instruction will be sent New York place orders with you presume my commission payable." The Pierce-Arrow Company responded to Perry's second cablegram and authorized him to sign a contract, which he did. It is beyond doubt that something took place between the sending of the two cablegrams which wrought a marked change in Perry's mental attitude towards the business which he had in hand. The first indicates no confidence on his part that he would be able to do business with the War Department; the second shows that he had become convinced that he could and that "large orders are certain." It is urged that these telegrams are merely hearsay and hence incompetent, but I do not think so. They are in the nature of verbal facts (3 Wigmore, Ev. 1768) disclosing the change which had taken place in Perry's mind, and its character. What produced this change? It had a cause. Something must have been said or done at the meeting in Goldsoll's office which led Perry to believe that the person to whom he had there talked could do what he had been unable to do,—that he had power to procure contracts where Perry had failed. On no other theory can the change be accounted for. Was that person Goldsoll, and, if so, what did he say?

The majority opinion says that Perry and Goldsoll did not come together until after the second cablegram was sent; but I think the facts, as I shall show, indicate otherwise—at least there is room for that inference; and if there is, that is sufficient for the purpose of this proceeding. Heliopoulos is relied upon to establish what the majority asserts, but his competent testimony does not do so. As I have shown, he testified that he was not present at any of the interviews which Perry had in Goldsoll's office prior to the time the contract was signed. He further said: "I was present at only one talk—the one where took place the signature of the contract and where Goldsoll was present." No one, then, tells us who made the repre-

sentations which induced Perry to send the second cablegram, but we do know that Goldsoll was present at the time the contract was signed and that it was made for his use and benefit. To be sure it runs in the name of Heliopoulos, but Goldsoll, according to the witness Thomas, stated that "he trades under the name of Heliopoulos to avoid the appearance of a monopoly," and Heliopoulos said: "I am not at all of the Goldsoll syndicate. I am only a simple intermediary." There is testimony to the effect that Heliopoulos was to have some interest in the contract, but the commissioner was justified in believing the testimony to which we have just invited attention as showing that Goldsoll had no associates,—that Heliopoulos was only an intermediary.

Somebody must have conducted the negotiations with Perry which resulted in the sending of the second cablegram and the making of the contract. I think it more reasonable to find that this was done by Goldsoll, the person interested, than by someone not interested. I think, also, that the facts recited warrant the inference that at the interview between Perry and Goldsoll the whole situation was gone over fully; that Perry explained to him that he was authorized to give the French government a discount of 15 per cent on five-ton trucks, and that he was unable to secure orders for trucks of any kind [under the circumstances what could have been more natural than a discussion of such matters between them]; also that the representations which induced Perry to send the second cablegram and close the contract were made by Goldsoll.

I next come to consider the nature of the representations made by Goldsoll.

Goldsoll came to this country in August of the same year, 1915, and had an interview with H. Kerr Thomas, assistant general manager of the Pierce-Arrow Company, in which he stated "that he was in position to control, through the War Department [of France] the giving of orders for American trucks," and asked that in the future he should be allowed $12\frac{1}{2}$ per cent and the French government only $7\frac{1}{2}$ per cent. This testimony was given in answer to a question by Mr. Becker,

special deputy attorney general of the State of New York. It is said in the majority opinion that there was an "apparent attempt in the examination of Mr. Thomas  *  *  *  to have him express an opinion inconsistent with that really entertained by him concerning the interview with Goldsoll." This criticism of a public official, endeavoring to perform his duty, is not, in my judgment, warranted by the record. Furthermore, the answer did not express an opinion. It was a positive statement of fact:—"Yes, he said so." Mr. Thomas was not a single person, easily misled. At no place did he show dissatisfaction with his answer or ask that he might be permitted to modify it. It is then stated that a fair reading of his entire testimony makes it very clear that his understanding of the interview with Goldsoll did not differ from that of Vice President May of the same company; and the conclusion is reached, as I understand it, that Thomas did not mean what he said when he answered the question under consideration. But this, I submit, is weighing the testimony,—the very thing the Supreme Court of the United States says this court may not do in a proceeding of this character. *Ornelas* v. *Ruiz,* 161 U. S. 502, 509, 40 L. ed. 787, 789, 16 Sup. Ct. Rep. 689.

The Pierce-Arrow Company, acting through Thomas, yielded to the request of Goldsoll and made a supplementary contract with him, providing that thereafter he should receive 12½ per cent and the French government 7½ per cent discount. When Goldsoll made the statement to Thomas that his relations with the French War Department were such that he could control the giving of orders for American trucks, he must have done so in the belief that it would persuade him to change the contract so as to give him, Goldsoll, the 12½ per cent. It was the only argument used. He was dealing with the same subject and seeking to accomplish the same end as those covered by the contract with Perry. Is it not a permissible inference that he felt that what had persuaded Perry would persuade Thomas, and hence that the representation in each case was identical,— that the statement made to Thomas "was a retrospectant indication" (3 Wigmore, Ev. sec. 148) of the representations made

to Perry? This may be indulging in niceties, but under the decisions of the Supreme Court of the United States to which I have invited attention, we are permitted to do that in a case of this kind, for we are seeking not for convincing proof, but for "any legal evidence" of the crime charged.

Goldsoll was a soldier of France, a gunner conductor in the artillery. In 1916, a year and some months after he made the contract of March 25 and while it was still being performed, he was in New York. General Vignal, his military superior, discovering that he was there without legitimate reason, ordered him to return to France, but he did not obey, claiming he "had a bad crisis of appendicitis." An examination by a physician showed that he was well. General Vignal then sought him with a view to again ordering him to France. After searching for sometime he was able to locate him, and renewed the order. Goldsoll then endeavored to influence the French officials to permit him to remain here, but without success. He was again ordered, and for a third time, to proceed to France, and also admonished that unless he obeyed he risked being condemned as a deserter in time of war. Still he lingered. Being a soldier, why this reluctance to return to his country at a time when she sorely needed fighting men? Does it not warrant the inference that he was conscious of having committed some wrong against her law? If so, it must be the crime for which his country now demands him, for the record does not show that he was at that time under any other charge. Flight, or refusal to return, which is the same thing, is a circumstance tending to show guilt. *Allen* v. *United States,* 164 U. S. 492, 41 L. ed. 528, 17 Sup. Ct. Rep. 154; *Bird* v. *United States,* 187 U. S. 118, 47 L. ed. 100, 23 Sup. Ct. Rep. 42. I think that these circumstances when taken together are sufficient to justify the belief that Goldsoll procured the contract of March 25 by representing that orders from the French government to the Pierce-Arrow Company for American trucks could be procured only through him, and that he knew at that time that the Pierce-Arrow Company was willing to allow the French government a discount of 15 per cent on five-ton trucks.

The falsity of the representations is abundantly established by the testimony of several witnesses, and clearly authorized a finding to that effect. But did the French government lose anything by reason of the representations? It is admitted that it was the practice of the Pierce-Arrow Company to allow a discount of 20 per cent from the list price of its trucks,—7½ per cent to the customer and 12½ per cent to the dealer. No matter what the division of the 20 per cent might be, the company always insisted upon receiving 80 per cent of its list price. The division, then, of the 20 per cent between the dealer and the customer in nowise affected the price which it received for its products. Perry, the London agent of the Pierce-Arrow Company, was authorized to sell five-ton trucks to the French government at a discount from the list price of 15 per cent. By the contract with Goldsoll he was to receive 7½ per cent; hence the French government could receive but 12½ per cent. Thus France was compelled to pay 2½ per cent more than it would have had to pay if the contract had not been made.

In April, 1915, two-ton trucks were ordered through Goldsoll, but the first order for five-ton trucks was not until November. In August, 1917, the Pierce-Arrow Company wrote the French government "that the price of its five-ton trucks comprises a commission that we are obliged to pay our agent," and followed with a statement that if it could secure a discharge of its obligation to pay the agent the commission it would reimburse the Republic "the entire sum or part of said commission of which it had been freed." The agent referred to was Goldsoll. As we have seen, he in September, 1915, induced the company to supplement the contract of March 25 by changing the rate of commission so that the French government would receive only 7½ per cent instead of 12½ per cent, and he would receive 12½ per cent instead of 7½ per cent. Under this arrangement the French government was obliged to pay 7½ per cent more for its trucks than would have been required of it if the arrangement had not been made. But as this arrangement was effected upon representations made in the United States, perhaps the additional amount which France had to pay on its

account cannot be attributed to the contract of March 25. The arrangement of September 25 did not, however, supplant the first contract. It only supplemented it, leaving the first contract as it was; and under that contract, as already appears, the French government contract had not been made.

This money was paid to the Pierce-Arrow Company by the French Republic, and it is urged that it thereby became the money of that company; that when Goldsoll received it it was the property of the company, and hence that it cannot be correctly said that he, by his false representations, defrauded the French Republic; that if he defrauded anybody it was the Pierce-Arrow Company. This is not tenable. While the company had the legal title to the money at the time it was delivered to Goldsoll, it had exacted the money from the French government because of the representations which he had made, and the French government was as truly defrauded as if the money had been paid directly to Goldsoll instead of through the Pierce-Arrow Company. In the Massachusetts, Kentucky, and other cases cited above, the legal title to the money received by the accused was not in the defrauded person at the time he received it; nevertheless it was held that he was guilty of obtaining money under false pretenses.

Equally untenable is the claim that since the complaint charges that the money was received *from* France, evidence that it was obtained from the Pierce-Arrow Company, which had received it from France, does not support the charge. The manner in which the money was obtained is specifically set out in the first count, and conforms strictly to the testimony adduced. A count must be construed as a whole, and when this is done there can be no doubt as to what is meant by the statement that the money was obtained *from* France. It is not necessary that the same exactness should be observed in a complaint as in an indictment or information, upon which the accused must stand trial. In *Bingham* v. *Bradley,* 241 U. S. 517, 60 L. ed. 1140, 36 Sup. Ct. Rep. 634, it appears that there was no allegation that the crime was committed in Canada, the requesting country; nevertheless the Supreme Court of the

United States sustained it, saying that it was inferable from statements in the complaint that the crime was committed there, and concluding with the observation that it was "clear that the intent was to charge that it was committed in Canada."

Finally, it is urged that if there was any evidence tending to show that Goldsoll committed the crime alleged, it was committed in the United States, and not in France, because while the false pretenses may have been made in France the money was obtained in the United States. He committed part of the offense in France and completed it in the United States. "We think it plain," says the Supreme Court of the United States, "that the criminal need not do within the State every act necessary to complete the crime. If he does there an overt act which is and is intended to be a material step toward accomplishing the crime, and then absents himself from the State and does the rest elsewhere, he becomes a fugitive from justice, when the crime is complete, if not before. *Re Cook,* 49 Fed. 833, 843, 844. *Ex parte Hoffstot,* 180 Fed. 240, 243. *Re Sultan,* 115 N. C. 57, 28 L.R.A. 294, 44 Am. St. Rep. 433, 20 S. E. 375. For all that is necessary to convert a criminal under the laws of a State into a fugitive from justice is that he should have left the State after having incurred guilt there (*Roberts* v. *Reilly,* 116 U. S. 80, 29 L. ed. 544, 6 Sup. Ct. Rep. 291), and his overt act becomes retrospectively guilty when the contemplated result ensues." *Strassheim* v. *Daily,* 221 U. S. 280, 285, 55 L. ed. 735, 738, 31 Sup. Ct. Rep. 578.

The evidence is by no means satisfactory or convincing, but it is not necessary that it should be. *Sternaman* v. *Peck,* 26 C. C. A. 214, 51 U. S. App. 312, 80 Fed. 884. *Re Herres,* 33 Fed. 165, 167, Judge Brewer said: "I might observe, with reference to these extradition proceedings, that the substance, and not the form, should be the main object of inquiry, and that they should not be conducted in any technical spirit with a view to prevent extradition."

The testimony may be entirely consistent with the innocence of Goldsoll, but whether it is or not is a matter with which we have no concern. All we are required to is to ascertain whether

there is "any legal evidence" on which to base the charge made against him.

The Supreme Court has shown in extradition proceedings a strong disposition to grant the request of the State interested whenever it is possible under the law to do so.   If ever there was a case where all doubt should be resolved in favor of extradition, this is the one.   Goldsoll, a citizen of France—more even than that, a soldier of France,—is charged with defrauding his government out of more than $1,500,000 at a time when it was in dire need.   France demands that he answer to her for his dereliction.   He appeals to the courts of this country to save him from making response to the charge.   I think his appeal should be denied, and that he should be returned to France that he may be acquitted if innocent, or punished if guilty.

A petition for appeal to the Supreme Court of the United States was denied May 10, 1919.